PJH
530 E-filing

# PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

FILED

Name  **MARROQUIN**        **MARCO**
    (Last)         (First)       (Initial)

Prisoner Number  **H-62380**

JUL 0 1 2008

Institutional Address  **P.O.Box 689, Soledad, CA 93960-0689**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

(PR)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**PJH**

**MARCO MARROQUIN**
(Enter the full name of plaintiff in this action.)

**CV 08    3153**

    vs.

Case No. _____
(To be provided by the clerk of court)

**BEN CURRY, (Warden)**

**PETITION FOR A WRIT
OF HABEAS CORPUS**

**EVIDENTIARY HEARING REQUESTED**

_____

_____

_____

(Enter the full name of respondent(s) or jailor in this action)

=====================================================

### Read Comments Carefully Before Filling In

#### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

1   Who to Name as Respondent

2         You must name the person in whose actual custody you are.  This usually means the Warden or

3   jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5   respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10  A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1.  What sentence are you challenging in this petition?

12             (a)    Name and location of court that imposed sentence (for example; Alameda

13                    County Superior Court, Oakland):   County of Los Angeles

14        Superior Court of California           Compton Courthouse

15                    Court                              Location

16             (b)    Case number, if known  TA016787

17             (c)    Date and terms of sentence  (1993); 15 years to life + 3 years

18             (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                    parole or probation, etc.)        Yes XXX      No _____

20                    Where?  Soledad, California

21                    Name of Institution: Correctional Training Facility-Central

22                    Address:  P.O.Box 689, Soledad, CA 93960-0689

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Second degree murder with gun use enhancement; P.C. §§187, 12022.5.

27  This petition addresses a parole suitability denial, due process and

28  equal protection violation.

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1    3. Did you have any of the following?

2        Arraignment:                    Yes __XXX__     No _____

3        Preliminary Hearing:            Yes __XXX__     No _____

4        Motion to Suppress:             Yes __XXX__     No _____

5    4. How did you plead?

6        Guilty _____    Not Guilty __XXX__   Nolo Contendere _____

7        Any other plea (specify) __None__

8    5. If you went to trial, what kind of trial did you have?

9        Jury __XXX__     Judge alone_____  Judge alone on a transcript _____

10   6. Did you testify at your trial?                Yes __XXX__     No _____

11   7. Did you have an attorney at the following proceedings:

12       (a)    Arraignment              Yes __XXX__     No _____

13       (b)    Preliminary hearing      Yes __XXX__     No _____

14       (c)    Time of plea             Yes __XXX__     No _____

15       (d)    Trial                    Yes __XXX__     No _____

16       (e)    Sentencing               Yes __XXX__     No _____

17       (f)    Appeal                   Yes __XXX__     No _____

18       (g)    Other post-conviction proceeding   Yes _____   No __XXX__

19   8. Did you appeal your conviction?               Yes __XXX__     No _____

20       (a)    If you did, to what court(s) did you appeal?

21              Court of Appeal              Yes __XXX__     No _____

22              Year: (1992)     Result: Relief denied

23              Supreme Court of California     Yes __XXX__     No _____

24              Year: (1993)     Result: Relief denied

25              Any other court              Yes __XXX__     No _____

26              Year: (1993-95)     Result: Relief denied

27

28       (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS       - 3 -

1    petition?                                    Yes _____    No **XXX**

2    (c)    Was there an opinion?                 Yes _____    No **XXX**

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4    **Does not apply to this cause of action.**    Yes _____    No **XXX**

5    If you did, give the name of the court and the result:

6    **Does not apply to this petition.** _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?            Yes **XXX**    No_____
     **Parole suitability denials, writs of habeas corpus**

10   [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]    **Does not apply to this cause of action.**

16   (a)    If you sought relief in any proceeding other than an appeal, answer the following

17   questions for each proceeding. Attach extra paper if you need more space.

18   I.    Name of Court: **Superior Court of California (Compton)**

19   Type of Proceeding: **Habeas Corpus petition**

20   Grounds raised (Be brief but specific):

21   a. **See attached petition, in full, and ORDER attached**

22   b. **hereto, an unreasoned opinion.**

23   c. _____

24   d. _____

25   Result: **Relief denied**            Date of Result: **1-9-2008**

26   II.   Name of Court: **Second Appellate District, Division Four**

27   Type of Proceeding: **Habeas Corpus/petition for review.**

28   Grounds raised (Be brief but specific):

1                  a. __See attached petition for writ of habeas corpus in__

2                  b.__full and "Post Card" denial attached hereto__

3                  c._____

4                  d._____

5                  Result: **Post card denial**      Date of Result: **1-31-2008**

6        III.    Name of Court: **State Supreme Court of California**

7            Type of Proceeding: **Habeas corpus/petition for review**

8            Grounds raised (Be brief but specific):

9            a. __See attached petition for writ of habeas corpus in__

10           b.__full and "Post Card" denial attached hereto.__

11           c._____

12           d._____

13           Result: **Post card denial**      Date of Result: **4-30-2008**

14        IV.    Name of Court: **Now in U.S.D.C. Northern District instant**

15            Type of Proceeding: **Petitionfor writ of habeas corpus**

16           Grounds raised (Be brief but specific):

17           a._____

18           b._____

19           c._____

20           d._____

21           Result: __"Currently before the Court"__Date of Result:_____

22    (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                Yes **XXX**    No____
                               **Northern District of California**

24        Name and location of court: __Number C 07-06098__

25   B. GROUNDS FOR RELIEF

26      State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1  need more space. Answer the same questions for each claim.

2  [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One: **See attached petition in full**

6

7  Supporting Facts: **See attached petition in full**

8

9

10

11  Claim Two: **See attached petition in full**

12

13  Supporting Facts: **See attached petition in full**

14

15

16

17  Claim Three: **See attached petition in full**

18

19  Supporting Facts: **See attached petition in full**

20

21

22

23  If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why: **Does no apply, all claims presented herein**

25  **were exhausted and fairly presented to all State Court. No State Court**

26  **rendered a "reasoned opinion" within the intent of the habeas corpus act.**

27  **Petitioner submits, to this Court, all claims, documents, exhibits as were**

28  **presented to the State Court.**

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4  Petitioner submits all case citations as authority in the attache petition,

5  as though set forth in full.

6  _____

7  Do you have an attorney for this petition?                    Yes_____      No XXX

8  If you do, give the name and address of your attorney:

9  Petitioner is being assisted by a "jailhouse" Attorney, an obvious layman
   at law.
10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on ___6 - 17 - 08___          _____

14              Date                          Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

Court of Appeal, Second Appellate District, Div. 4 - No. B205213
**S160809**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re MARCO MARROQUIN on Habeas Corpus

The petition for review is denied.

**SUPREME COURT**
**FILED**

APR 3 0 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

COURT OF APPEAL - SECOND DIST.

F I L E D

JAN 3 1 2008

JOSEPH A. LANE
S. VEVERKA                    Clerk

                              Deputy Clerk

In re MARCO MARROQUIN,

on Habeas Corpus.

B205213

(Los Angeles County
Super. Ct. No. TA016787)
(Peter Espinoza, Judge)

ORDER

THE COURT:*

The petition for writ of habeas corpus filed on January 25, 2008, has been read and considered and is denied. Petitioner has failed to state sufficient facts or legal authority demonstrating entitlement to the relief requested. There is "some evidence" to support the findings of the Board of Parole Hearings. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.)

*WILLHITE, Acting P.J.          MANELLA, J.          SUZUKAWA, J.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | JANUARY 9, 2008 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

|  | (Parties and Counsel checked if present) | |
|---|---|---|
| | BH 004981 | |
| | In re,  MARCO MARROQUIN,  Petitioner,  On Habeas Corpus | Counsel for Petitioner:  Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on November 6, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on December 24, 1993 after a conviction for second-degree murder with use of a firearm. He was sentenced to eighteen years to life in prison. His minimum parole eligibility date was December 24, 2003. The record reflects that in August 1991, the victim and his girlfriend agreed to buy a car from petitioner. They drove the car for several days before discovering that it had several defects, at which point, they attempted to return the car. Petitioner demanded $1000 for use of the car during the time it was in the victim's possession. He refused to pay. Several months later, on January 12, 1992, petitioner and the victim showed up at the same bar. The victim left to move his car, after which petitioner also left. When petitioner attempted to re-enter the bar, he was stopped by security for carrying a firearm. He then saw the victim again outside the bar and began yelling at him about the money for the car. The victim still would not pay. Petitioner then drew a semiautomatic pistol and threatened to kill the victim. He pulled the trigger once, but the gun did not fire so he pulled it again. The second shot hit the victim in the side. He died as a result of a gunshot wound to the abdominal cavity. Petitioner claims that he feared for his life because the victim smashed a bottle and began threatening him with it. However, witnesses to the events did not hear the sound of glass breaking and did not see the victim holding anything in his hands prior to the shooting.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on July 25, 2007. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The nature of the commitment offense may indicate that a prisoner poses an unreasonable risk of danger to society when the offense is especially heinous, atrocious or cruel. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1); *Rosenkrantz* at 682-683.) In this case, the Board found that the commitment offense was especially heinous "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or

1

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | JANUARY 9, 2008 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004981

In re,
MARCO MARROQUIN,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4[th] 871, at 893.) In this case, the motive for the shooting was a dispute over a car that occurred several months earlier. The Board stated, "You have the capacity to take the law into your own hands, and more importantly to take the life of another simply because the underlying dispute didn't go your way." (*Reporter's Transcript*, July 25, 2007, p. 44.) This demonstrated to the Board that petitioner was posed an unreasonable risk of danger to society. The Court finds that there is some evidence to support that conclusion.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Marco Marroquin
H-62380
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689

Department of Justice – State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

| Minutes Entered |
|---|
| 01-09-08 |
| County Clerk |

# PETITION FOR REVIEW

Comes now, Marco Marroquin, Petitioner in pro se, and through this verified petition for review requests this Court to review and adjudicate the claims raised thus reviewing the denial from the Superior Court of Los Angeles (attached hereto), as Petitioner asserts that the denial by that court was based on an unreasonable application of U.S. Supreme Court law where the Superior Court relied on the commitment offense to support their finding of "some evidence" and establishing that the court violated the doctrine established by the Ninth Circuit regarding "IMMUTABLE", "UNCHANGEABLE FACTORS" which violates state and federal due process.

The Superior Court failed to adjudicate the "CLASS OF ONE" equal protection claim and it appears from the "denial" that the court did not even read the petition but relied on the Board's conclusion wherein Petitioner was denied suitability. Understanding the fact that within the Legislative intent of P.C. §3041(a)(b) Petitioner can never be paroled but only deported via being turned over to INS. See habeas petition in full.

The main crux of the Superior Courts denial, "The nature of the commitment offense may indicate that a prisoner poses an unreasonable risk of danger to society when the offense is especially heinous, atrocious or cruel", also, "The motive for the crime is inexplicable or very trivial in relation to the offense".

Even though suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made it clear that the "findings that are necessary to deem a prisoner unsuitable for parole," Irons, 505 F.3d at 851, 2007 WL 2927359, at *3, are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety. In re Dannenberg, 156 Cal.App.4th 1387, 2007 WL 3408290, at *9 (Cal. Ct. App. 2007), modified, 2007 Cal.App. LEXIS 1985, 2007 WL 4227229 (Cal. Ct. App. Dec. 3, 2007); In re Lee, 143 Cal.App.4th 1400, 1408,

1

49 Cal.Rptr.3d 931 (Cal. Ct. App. 2006); In re Scott, 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 (Cal. Ct. App. 2005); See, Cal. P.C. §3041(b) (providing that the Board "shall set a release date unless ... consideration of the public safety requires a more lengthy period of incarceration for this individual."). The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." Lee, 143 Cal.App.4th at 1408.

"In some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." Irons, 505 F.3d at 854, 2007 WL 2027359, at *6.

Petitioner submits that, after the "first" suitability denial where the commitment offense is "relied upon" to judge a threat level it would obviously violate due process to rely on the same commitment offense to deny suitability because it would equate to a pre-determined denial that would go on forever until the inmate dies. The application of the commitment offense, after the initial hearing would convert Petitioner's second degree sentence of 15 years to life to a sentence of life without the possibility of parole.

"The commitment offense can negate suitability only if circumstances of the crime reliably established in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." Scott, 133 Cal.App.4th at 595.

### DENIAL BASED ON IMMUTABLE FACTORS

The "some evidence" standard is not met when the Board basis its denial, either in part or entirely, on immutable circumstances beyond the defendant's ability to change." (In re Elkins, 144 Cal.App.4th at 523).

The federal courts have likewise expressed grave concerns of the potential for due process violations in applying the "some evidence" standard to immutable parole factors. In the landmark decision of Biggs v. Terhune, the Ninth Circuit, while upholding a finding of parole unsuitability, the court admonished in dictum that the parole board's continued reliance on unchanging factors raises the strong possibility of a due process violation. (Biggs v. Terhune, 334 F.3d at 917). The defendant in Biggs was convicted of murdering a potential witness in an unrelated criminal case. Although Biggs was a model inmate in prison, he was found unsuitable for parole based on the hideous character of the commitment offense. (Ibid.) Although upholding the denial of parole, the Ninth Circuit made it unmistakably clear that it would not tolerate repeated parole denials on factors the inmate could not change. The court expressly found that inmates have a due process liberty interest in parole, and that this interest is infringed upon by repeated denials based on immutable factors. (Id., at pp.914-915 [citing Allen, 482 U.S. at p.373; Greenholtz, 442 U.S. at pp.7, 11-12.).

Even assuming a murder meets the definition of "especially heinous, atrocious or cruel," (unchangeable circumstances) the predictive value of the commitment offense becomes highly questionable after a long period of incarceration. (In re Scott II, 133 Cal.App.4th at pp.594-595.).

## ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL

Petitioner asserts here and in his petition that these factors do not apply and cannot be applied to second degree and/or first degree murder convictions under P.C. §187. The phraseology above was adopted by the Board for its rules and regulations §2402, from P.C. §190.2 (Death penalty or life imprisonment without parole; special circumstances), specifically the language at (a)(14) is at issue:

> "The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As used in this section, the phrase "especially heinous, atrocious, or cruel, manifesting exceptional depravity" means a conscienceless or pitiless crime that is unnecessarily torturous to the victim." (emphasis added).

3

P.C. §190.2(a)(14)'s language regarding "particularly egregious, atrocious or cruel" is only intended to differentiate and separate crimes of murder in the first and second degree (under P.C. §187) from execution style murders and/or "particularly egregious, heinous, atrocious or cruel murders" (under P.C. §190.2). Many courts have applied the terminology of "common scenario", "typical", "normal" (citations omitted) when comparing crimes of murder. "Particularly egregious, heinous, atrocious or cruel" are applied to virtually all suitability denials. The Board has effectively circumvented the Legislative intent of P.C. §187 by 'lumping' all crimes of murder into a neatly scribed Rules and Regulations where 'all' crimes of murder are treated under the language found in P.C. §190.2(a)(14) (Death penalty or life without the possibility of parole).

The Superior Court of California, County of Santa Clara, FILED AUG 30, 2007, In re DONNELL JAMEISON, No. 71194 authorized a study of some 2690 randomly chosen cases (parole suitability denials), where it was established that "particularly egregious" or "especially heinous, atrocious or cruel" (15 C.C.R. §2402(c)(1) were found to contain the same language.

An inmate's past criminal history, including involvement in other criminal misconduct which is reliably documented, is relevant to his parole suitability. (Cal. Code Regs., tit. 15, §2402(b).) As with other immutable factors, however, the Board's continued reliance on an inmate's pattern of criminality and unstable social history at the time of the offense violates due process when these factors are outweighed by a current record of reform. (In re Scott II, 133 Cal.App.4th at pp.593-594.) Petitioner asserts that his prison record is "spotless" and his psychological evaluation is positive of release on parole.

Greenholtz, spoke in detail about the purpose of parole being rehabilitation and, most important, recognized that an inmate's record <u>during confinement</u> indicates whether release on parole is appropriate. Therefore, even in the absence of Ninth Circuit case law clarifying the scope of Biggs, Greenholtz is still

4

compelling law.

The facts of the unchanged circumstances must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearings, but counterpoised against the backdrop of prison events. Bair v. Folsom State Prison, 2005 WL 2219220, *12 n.3 (E.D. Cal. 2005), report and recommendation adopted by, 2005 WL 3081634 (E.D. Cal. 2005).

In Irons v. Warden of California State Prison-Solano, 358 F.Supp.2d 936, 947 (E.D. Cal. 2005) the court asks rhetorically:

> "What is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crime will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial. Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility."

The courts holding that the Board's use of unchanging factors to deny parole is in violation of due process. Rosenkrantz v. Marshall, 444 F.Supp.2d, 1063 (C.D. Cal. 2006).

## INEXPLICABLE MOTIVE (TRIVIAL)

Regarding the Board's (and Superior Court's) statement that, "the motive for the crime is inexplicable or very trivial in relation to the offense"; As was observed in Scott I, 119 Cal.App.4th at p.892, "An 'inexplicable' motive, as we understand it, is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim[s] and has no other discernible purpose. A person whose motive for a criminal act cannot be explained or is unintelligibile is therefore unusually unpredictable and dangerous." Barker's motive was not "inexplicable" under this definition.

Similarly, the record does not indicate that Barker's motive was "very trivial in relation to [his] offense." (§2281(c)(1)(E).) "The offense committed by most

5

1   prisoners serving life terms is, of course, murder. Given the high value our

2   society places upon life, there is no motive for unlawfully taking the life of

3   another human being that could not reasonably be deemed 'trivial'. The Legislature

4   has foreclosed that approach, however, by declaring that murderers with life

5   sentences must 'normally' be given release dates when they approach their minimum

6   eligible parole dates... (Scott I, 119 Cal.App.4th at p.893).

7       "The reference in the Board's regulations to motives that are "very trivial"

8   in relationship to the offense" therefore require comparison. To fit the regulatory

9   description, the motive must be materially less significant (or more "trivial")

10  than those which conventionally drive people to commit the offense in question,

11  and therefore more indicative of a risk of danger to society if the prisoner is

12  released than is ordinarily presented." (In re Scott I, supra, 119 Cal.App.4th

13  at p.893).

14      The money owed for the car is being misconstrued as the motive for the

15  shooting. The facts establish that Petitioner, assuming for argument, that he

16  incorrectly perceived an imminent threat upon his life (Ceja, Flannel, etc.) and

17  what he perceived as being attacked with a broken beer bottle (see evidence list)

18  shot the victim in the arm. The motive was perceived as self defense and not as

19  a collection of a debt. Nothing in the record could be construed as establishing

20  that Petitioner went to the bar to collect a debt, Petitioner had no prior

21  knowledge that the victim was at the bar, thus the application of 'trivial' by

22  the Board and Superior Court to justify "some evidence" is an incorrect assessment

23  of the facts presented. What was perceived, even if incorrectly, as an imminent

24  threat upon his life cannot be presumed to be a 'trivial' motive. As the record

25  establishes, Petitioner shot the victim in the arm, no intent to kill was

26  established. The victim's death was caused by the bullet 'traveling' through the

27  arm and into the chest. Petitioner is none the less responsible and remorseful

28  for the death that he caused that evening but the death was not intentional. (See

6

petition in full).

The key phrase, by Legislative intent, to separate offenses of murder under P.C. §187 (1st and 2nd degree), from P.C. §190.2 (Death penalty and life without the possibility of parole) offenses is in (a)(14): "A conscienceless or pitiless crime that is unnecessarily torturous to the victim." (Emphasis added). Thus, the language of "especially heinous, atrocious or cruel" (relied upon by the Board and Superior Court to deny suitability) cannot be applied to offenses under P.C. §187, unless, "unnecessarily torturous" was found to be true by a jury.

Petitioner asserts that the Superior Courts decision was contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, and, that the Superior Court based its decision on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §2254(b), as set forth herein and in the habeas corpus petition. Petitioner further asserts that the Superior Courts judgment was erroneous under the standard of §2254(d). See, Ylst v. Nunnemaker, 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

Petitioner's commitment offense, which occurred over 16 years ago, cannot demonstrate that his release (for deportation) will pose an imminent danger to public safety. See, Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1084 (C.D. Cal. 2006) ("While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances—after nearly two decades of incarceration and half a dozen parole suitability hearings—violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil."); Scott, 133 Cal.App.4th at 595 ("[T]he predictive value of the commitment offense

may be very questionable after a long period of time.").

Even if the Superior Courts interpretation of the facts is the correct one, the unchanging factor of Petitioner's motive for committing the crime (be it the car debt owed, or, the perceived threat on his life) did not provide a factual basis for the Superior Court (and Board) to conclude that his release presented a risk to public safety. The Superior Court, and Board, violated Petitioner's due process rights by relying on the unchanging factor of motive for the commitment offense in denying release to INS for deportation.

Petitioner has served beyond the minimum sentence as articulated in Biggs and Sass, and with earned credits he has served within the range of a sentence for first degree murder.

Petitioner further submits that his Psychological Evaluation supports release on parole even though Petitioner will be deported, thus the Board and the Superior Court never addressed the issues presented regarding the criteria for suitability under P.C. §3041(b) cannot be applied to a prisoner with an "INS" hold for deportation, prisoner's with "INS" holds cannot comply with the requirements laid down by the Boards Rules and Regulations suitability criteria under §2402.

Respectfully submitted,



Marco Marroquin


Petitioner incorporates his Habeas Corpus petition and supporting exhibits as though set forth in full.

8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF THE CASE

Petitioner incorporates the statement of facts (summary of the commitment offense) from the parole hearing transcripts, as though set forth in full, (herein after, reference to Exhibit "A"), at page(s) stated, without re-iteration herein.

## FACTS AS SET FORTH

On July 25, 2007 Petitioner appeared before the Board of Parole hearings (herein after 'Board') for a subsequent hearing, his 3rd, the subject matter of this petition. The hearing panel consisted of two members, A. Stanley Kubochi, Presiding Commissioner, David Yacono, Deputy Commissioner, Candice Christensen, Attorney for Petitioner, Lawrence Morrison, Deputy District Attorney, and, Jose Zavala, Interpreter for Petitioner.

Petitioner was subsequently denied release for deportation and was given a one year denial, he was also denied a term setting under the equal protection clause of the United States and California constitutions. See, CLAIM NUMBER TWO (II).

## JURISDICTION AND VENUE

Habeas corpus is the proper remedy for due process and equal protection violations by the Board. See, In re Powell, (1988) 45 Cal.3d 894, 903. This Court has original jurisdiction to issue the writ, and venue to adjudicate this petition. Griggs v. Superior Court, (1976) 16 Cal.3d 341; see also, In re Sena, (2001) 94 Cal.App.4th 836.

//

//

//

i

STATE AND FEDERAL CLAIM NUMBER ONE (I)
CALIFORNIA PENAL CODE §3041(a)(b) CREATES A PROTECTABLE
LIBERTY INTEREST AT A PAROLE SUITABILITY HEARING, AND A
"REASONABLE" EXPECTATION OF A RELEASE DATE. THE COMMANDING
WORD "SHALL" CLEARLY ESTABLISHES THIS EXPECTATION.

Under California law, a convicted person sentenced to a term of 15/25 years 'to life' shall be released on parole unless his release would pose an unreasonable risk to public safety or unreasonable risk to society if released from prison. Cal. P.C. §3041(a)(b); Cal. Code of Regs., Title 15, §§2400-2411.

## DUE PROCESS IN THE PAROLE CONTEXT

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law. United States Constitutional Amendments, V, XIV.

It is now settled that California parole scheme, codified in California Penal Code section §3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002)).

Under the "clearly established" framework of Greenholtz and Allen, we hold that California's parole scheme gives rise to a cognizable liberty interest on parole. The scheme "creates a presumption that parole release will be granted" unless the statutorily defined determinations are made." Allen, 482 at 378 (quoting Greenholtz, 442 U.S. at 12). In, In re Deluna, 126 Cal.App.4th 585, 24 Cal.Rptr.3d 643 (2005), held that under Rosenkrantz and McQuillon, parole applicants continue to have a "liberty interest" in parole release.

//

//

1

STATE AND FEDERAL CLAIM NUMBER TWO (II)
THE BOARD (BPH) VIOLATED PETITIONER'S DUE PROCESS AND EQUAL
PROTECTION RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE U.S.
CONSTITUTION, AND, CALIFORNIA CONSTITUTION ARTICLE I, Sec.
7(a), WHEN THEY FAILED TO CONSIDER A PAROLE RELEASE DATE
UNDER P.C. Section §3041(a), (SEPARATE AND DISTINCT TREATMENT
OF A "CLASS OF ONE").

For an equal protection claim to proceed Petitioner must allege specific
facts in support of his claim. A habeas petitioner has the burden of alleging
specific facts that show a federal claim is presented, or the petition is subject
to dismissal. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995). Conclusory
allegations do not warrant habeas relief. Id. at 204.

Petitioner's allegations are not conclusory, they state a prima facie equal
protection claim under both the California and U.S. Constitution.

The U.S. Constitutions Fourteenth Amendment Equal Protection Clause provides
that no State shall deny to any person "the equal protection of the laws." See
also, California Constitution Article I, Sec. 7(a). The Equal Protection Clause
ensures that "all persons similarly situated should be treated alike." City of
Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). To prevail on an
equal protection claim, Petitioner must initially show that he was treated
differently from other similarly situated persons. City of Cleburne, supra, 473
U.S. at 439; Fraley v. U.S. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993).

The mere fact that some inmates convicted of second degree murder may have
been paroled sooner than Petitioner does not establish the basis for a federal
equal protection claim. See, Sturm v. California Adult Authority, 395 F.2d 446,
448-49 (9th Cir. 1967) (holding that, "the fact that other prisoners have had
their sentence reduced, or been granted parole, affords no ground for complaint
by petitioner.")

However, Petitioner's equal protection claim lies elsewhere, other than
a mere comparison between an inmate released earlier or paroled sooner than
himself, as set forth herein.

2

## EQUAL PROTECTION UNDER "CLASS OF ONE"

In the case of In re MIKAEL SCHIOLD, Court of Appeals, First Appellate District, Division Five, Case No. A103107, attached hereto with MOTION FOR JUDICIAL NOTICE, as Exhibit "B". (With reference to numbered paragraphs).

Schiold was transferred to the country of Sweden, under the "SETTLEMENT AGREEMENT AND FULL AND FINAL RELEASE OF ALL CLAIMS", on habeas corpus. Schiold and Respondents entered into a "SETTLEMENT AGREEMENT" transferring Schiold to Sweden. (Paragraph #4 of Exhibit "B").

Case No. A103107 was agreed to as "stayed" pending Schiold's transfer. (Paragraphs #5,6,7, of Exhibit "B").

Explicitly at paragraph #8 (of Exhibit "B"): "Releasor (Schiold) agrees that he will be held in custody by the government of Sweden until January 1, 2007."

Page 5, paragraph #16 (of Exhibit "B"), establishes that: The agreement and settlement, in order to stay the case, was signed by the Supervising Deputy Attorney General, Anya Binsacca, dated 10/22/2003.

Petitioner asserts that the State of California in collusion with the Attorney General's Office and the Board did in fact violate the equal protection clause of the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), by "setting an immutable release date" for Schiold, when his term was set without being found suitable under §3041(b) and going directly to §3041(a).

The language in paragraph #8 of page 3 (of Exhibit "B"), of the "SETTLEMENT AGREEMENT" expressly states that "he will be held in custody of the government of Sweden UNTIL January 1, 2007." Petitioner asserts that this date, January 1, 2007, established a 'term setting' under §3041(a). (Emphasis added).

A foreign national (Schiold) is being treated distinctly different than 'all' U.S. Citizens, and, foreign nationals that have not caused legal actions

3

to enter into "SETTLEMENT AGREEMENTS", in California serving a sentence of life with the possibility of parole. Petitioner is being treated distinctly different than Schiold because he cannot be transferred to another country, and all similarly situated prisoners, thus creating separate and distinct "classes" of inmates for release criteria.

The fact that Schiold was found suitable by the Board is irrelevant to the claim herein, as the Governor over-ruled the Board's determination and found Schiold to be unsuitable, which nullified the Board's finding of suitability. See, paragraphs #2,3,6 (of Exhibit "B"). Schiold's term was set at January 1, 2007, AND, Schiold does not have to serve any parole time after being released. See, "SETTLEMENT AGREEMENT".

The most basic requirement for a claim of violation of equal protection under the Fourteenth Amendment of the U.S. Constitution lies on the issue of non-equal treatment of a "CLASS", or, a showing of separate and/or distinct difference in treatment, both criminally and civilly, among groups or "CLASSES" of persons.

The U.S. Supreme Court has established a "class of one" in the case of Village of Willowbrook v. Olech, 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073 (2000) at pp.1074-75: "We granted certiorari to determine whether the Equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff did not allege membership in a class or group." (527 U.S. 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).):

> "Whether the complaint alleges a class of one or a class of five is of no consequence because we concluded that the number of individuals in a class is immaterial for equal protection analysis."

Our cases have recognized successful equal protection claims brought by a "class of one", where the plaintiff alleges that he/she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. Sioux City Bridge Co., v. Dakota County,

4

1  260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburg Coal Co.

2  v. Commission of Webster City, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688

3  (1989). "In so doing, we have explained that 'the purpose of the equal protection

4  clause of the Fourteenth Amendment is to secure every person within the State's

5  jurisdiction against intentional and arbitrary discrimination, whether occasioned

6  by express terms of a statute or by its proper execution through duly constituted

7  agents." Sioux City Bridge Co., supra, at p.445, 43 S.Ct. 190 (quoting Sunday

8  Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495 (1918).)

9      "It is clearly established that a state violates the equal protection clauses

10  when it treats one set of persons differently from others who are similarly

11  situated." Wheeler v. Miller, 168 F.3d 241, 252 (5th Cir. 1999).

12      Petitioner has established separate treatment, discrimination, and the

13  Board's failure to follow U.S. Supreme Court precedents, thus their failure to

14  set Petitioner's term, as was done to Schiold, violates both the California and

15  U.S. Constitutions Equal Protection Clauses.

16                    ### FAILURE TO CONSIDER TERM SETTING

17      At no time during the hearing(s), nor at any time during Petitioner's

18  incarceration has the Board considered the determinate term that Petitioner would

19  serve, as calculated by Title 15 C.C.R. §2404, (Matrix), or the time he has

20  actually served as factors in the suitability equation. The Court of Appeals

21  in, In re Ramirez, (2001) 94 Cal.App.4th 549, at 569 held:

22          "The Board cannot ignore the determinate term prescribed for a
           commitment offense when it considers the gravity of the crime as a
23          factor weighing against a finding of suitability for parole. The Board
           must make its determination 'in a manner that will provide uniform
24          terms for offenses of similar gravity and magnitude in respect to their
           threat to the public.' (P.C. §3041(a).) Determining what would be a
25          'uniform' term for an inmate serving a determinate term for offenses
           that include concurrent determinate terms is not an exact science.
26          However, the Board should strive to achieve at least a rough balance
           between the gravity of the offense, the time the inmate has served,
27          and the sentences prescribed by law for the commitment offense."
                                                              //
28                                                            //

                                      5

1

At page 570, the court said:

2

"The Board must also consider the length of time the inmate has served
in relation to the terms prescribed by the Legislature for the offenses
under consideration, in order to arrive at a "uniform" term as
contemplated by P.C. §3041(a)."

3

4

The gravity of Petitioner's offense must be measured not in terms of the

5

life maximum potential, but in relation to the determinate terms prescribed for

6

such offenses in 15 C.C.R. §2403(c). The Board must consider the appropriate

7

determinate term that would be set and the time he has already served. The Board

8

has failed to follow the criteria of §2403(c). (Note: The Board is still in

9

violation by rules and regulations that they are applying.)

10

## FAILURE TO FIX PRIMARY TERM

11

At no time during Petitioner's incarceration has the Board ever held a

12

hearing to fix Petitioner's 'primary term' on his indeterminate sentence. A

13

'primary term' is not set in conjunction with or dependent upon a parole hearing.

14

In re Rodriguez, (1975) 14 Cal.3d 639; People v. Scott, (1984) 150 Cal.App.3d

15

910, 918-19. Petitioner has a right to have his term fixed proportionately to

16

his offense and his culpability.

17

The Los Angeles County Superior Court, on June 26, 2006, In re Robert

18

Rosenkrantz, Case No. BH003529, attached as (Exhibit "C") to MOTION FOR JUDICIAL

19

NOTICE, specifically at page 3, lines 14-15 establish that the Board set

20

Rosenkrantz term: "On September 9, 1999, petitioner was found unsuitable for

21

parole but the panel set his prison term." A June 30, 2001 date was set for

22

release. (Emphasis added).

23

Evaluating proportionality does not hinge on the life maximum, but is

24

measuring the time actually served with the sentence deemed appropriate by the

25

Board's sentencing regulations. The Board cannot abdicate this responsibility

26

either by saying it has no authority to fix terms (See, Schiold and Rosenkrants,

27

supra), or by sub-summing term-fixing under the parole function. Petitioner is

28

6

1  entitled to the fixing of his primary term as an ultimate, immutable release
2  date, under the Equal Protection (CLASS OF ONE) of the Fourteenth Amendment.
3  See also, In re Rodriguez, supra; People v. Duran, (1983) 140 Cal.App.3d at
4  502-503; People v. Rodriguez, (1977) 19 Cal.3d 221, 230; Rosenkrants, supra.

5      In McGinnis v. Royster, 93 S.Ct. (1973) the court held, at page 1057 that:

6      "Each inmate has both a 'minimum' parole date, which is the earliest
       date on which he 'may' be paroled at the discretion of the Parole Board,
7      and a 'statutory release' date which is the earliest date he 'must'
       be paroled by the Parole Board. (Fn.3), "He also has a maximum
8      expiration date which is the date of the maximum sentence to which
       an inmate can be held if he receives no good time credits at all."

9  The case refers to an 'indeterminate sentence' and establishes that there
10 are actually three (3) dates to such a sentence; (1) the minimum parole date,
11 (2) the statutory release date, (3) the maximum expiration date (i.e., death).

12     While P.C. §1170 et seq., apply to determinate sentences, the current
13 provisions of P.C. §3041 governing parole for inmates serving indeterminate terms
14 were added as part of the bill enacting the Determinate Sentencing Law, and were
15 intended to serve the same purpose as the determinate sentencing provisions.
16 (Stats., 1976 Ch. 1139, Sec. 281, p.5151; In re Stanworth, (1982) 33 Cal.3d 176,
17 182). Our Supreme Court has made it clear that the 'uniform terms' called for
18 by section §3041(a) are analytically equivalent to determinate sentences imposed
19 under §1170 et seq. (People v. Jefferson, 21 Cal.4th 86, 96).

20     Apparently, the State of California only follows the law and sets a life
21 prisoner's term when it is convenient, to avoid or terminate legal actions (by
22 entering into "SETTLEMENT AGREEMENTS"), or in an arbitrary manner, with no regard
23 to violating due process and equal protection rights under both California and
24 U.S. Constitutional mandated guidelines.

25                                    //
26                                    //
27                                    //
28

                                     7

STATE AND FEDERAL CLAIM NUMBER THREE (III)
THE STATE OF CALIFORNIA HAS CREATED A MORE COMPREHENSIVE
RIGHT FOR ITS RESIDENTS THAN THE FEDERAL GOVERNMENT FOR THE
APPLICABLE EVIDENCE STANDARD APPLIED TO PAROLE SUITABILITY
HEARINGS UNDER CALIFORNIA EVIDENCE CODE Sec. §115 HEREIN.

The Board of Prison Hearings has violated Petitioner's due process and equal protection rights under the Fourteenth Amendment of the U.S. Constitution, and, California Constitution Article I, Sec. 7(a), a right created by the Legislature of California and by its intent to create an evidence code (§115) that creates a minimal standard of 'evidence' requirement for all situations.

'Some evidence', as applied by the Board, and, used as a judicial tool to review the Board's decision for due process violations, is not the legal standard, especially under California law, see Evidence Code §115; also, U.S. Supreme Court precedents, herein asserted, establish that "preponderance of evidence" is the legal (minimum) evidence standard for parole suitability hearings and not the defunct 'some evidence' standard relied upon by either the Board, and/or Governor. Although the courts do rely on "some evidence" to determine if there is any evidence in the Board's denials (records) it must be "some evidence" that a "preponderance of evidence' exists in the record to support a denial.

The U.S. Supreme Court in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004) stated that:

> "As the Government itself has recognized, we have utilized the "some evidence" standard in the past as a standard of review, not as a standard of proof."

The Court further explains that:

> "It primarily has been employed by courts in examining an administrative record developed after an adversarial process at least of the sort that we today hold is constitutionally mandated in the citizen enemy-combatant setting." See, e.g., Hill, 472 U.S., at 455457, 105 S.Ct. 2768.

The Hamdi court further explains that: "...for determining the procedures that are necessary to ensure that a citizen is not "deprived of life, liberty or property, without due process of law," U.S. Const. Amdt. 5, is the test that

8

1  we articulated in Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d

2  18, (1976):

3      "We agree with the prevailing view and conclude that Hill addressed
        only the appropriateness of 'some evidence' as a standard of appellate
4       review, not as a standard of proof. Therefore, we now seek to determine
        through our own analysis the appropriate fact-finding standard to be
5       used by the DOC. To determine whether a standard of proof in a
        particular type of proceeding satisfies due process, the Supreme Court
6       has prescribed a three-factor test that examines: (1) the private
        interest affected, (2) the risk of erroneous deprivation of such
7       interest, and (3) the government's interest."

8      In Carrillo, Supreme Court of Minnesota, 710 N.W.2d 763, 2005 Minn. LEXIS,

9  424, Filed July 28, 2005, that court relied on Eldridge and Hamdi and held that:

10     "Taking the Supreme Court's three factors into consideration, we
        conclude that the "some evidence" standard is inappropriate for use
11      by the DOC at the fact-finding level. We conclude that the
        "preponderance of evidence" standard better protects against an
12      erroneous deprivation of an inmate's liberty interest in his supervised
        release date and does not pose an unacceptable burden on the DOC.
13      Therefore, we conclude that a DOC hearing officer must find by a
        preponderance of evidence that Carrillo has committed a disciplinary
14      offense before the commissioner can extend the date of his supervised
        release. Accordingly, we hold that the district court and the court
15      of appeals erred when they denied Carrillo's petition for writ of habeas
        corpus."

16
        The State of California, by Legislative intent, has conferred more, or a
17
   greater, evidence standard upon the Board, and Governor's review, (and judicial
18
   review), by making the 'minimum' evidence standard "preponderance of evidence",
19
   rather than that espoused in Hill, i.e., "some evidence". See also, Jurasek v.
20
   Utah State Hospital, 158 F.3d 506 (10th Cir. 1998), "The state may confer more
21
   comprehensive due process protection upon its citizens than does the federal
22
   government."
23
        Petitioner contends that a reasonable understanding of the holding in Hamdi
24
   v. Rumsfeld, relied upon in Carrillo, supra, Eldridge, supra, is that a court
25
   will apply the "some evidence" standard to review records, of both the Board's
26
   and Governor's denials for suitability of parole, to see if there was proof under
27
   the "preponderance of evidence" standard mandated by California Evidence Code
28

                                          9

1  Sec. §115, not, that the record of the Board's, or Governor's, denial of

2  suitability, decision only requires "some evidence" of proof, as is always applied

3  by the Board for denial, and, by the Governor for review.

4      Petitioner's due process rights were violated when the defunct minimally

5  necessary evidence (some evidence) standard was applied in place of preponderance

6  of evidence as is mandated by California Evidence Code section §115, second

7  paragraph; "Except as otherwise provided by law, the burden of proof requires

8  proof by a preponderance of the evidence."), and U.S. Supreme Court precedents

9  herein listed.

10     Thus, the Hill; supra, "some evidence" standard is being applied to

11  circumvent and over-ride the California Constitutions duly elected Legislatures

12  intent to confer a greater due process protection upon its citizens when they

13  enacted Evidence Code §115 (Preponderance of evidence as the minimal standard

14  of proof or review) than does the federal courts Hill standard of "some evidence".

15                          //

16                          //

17                          //

18

19

20

21

22

23

24

25

26

27

28

1

2    STATE AND FEDERAL CLAIM NUMBER FOUR (IV)
THE BOARD VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE
FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION, AND,
3    CALIFORNIA CONSTITUTION ARTICLE I, Sec. 7(a) WHEN THEY DENIED
PAROLE BASED ON P.C. §3041(b) TO ARRIVE AT "SOME EVIDENCE"
4    TO BOOTSTRAP THEIR DENIAL OF SUITABILITY FOR RELEASE ON PAROLE,
A PRE-DETERMINED OUTCOME.

5

6    Not withstanding Petitioner's CLAIM NUMBER TWO and THREE, and, Petitioner's

deportation issue/claim herein, Petitioner asserts this "some evidence" claim.
7
Pages 43-50 of Exhibit "A", the Board states:
8
### DECISION
9
Page 43: "...we have reviewed all information and we're going to deny
10    you parole for a year." "In looking at the facts of the crime itself,
this offense was carried out in a very callous manner..."
11
Page 44: "Your motive for this crime was inexplicable and very trivial
12    in relation to the offense."

13    Page 44: "You have not worked, you have not obtained a vocation." "All
the time from 2000, you have been in Adult Basic Education." "...from
14    2000, you have no vocation skills." "From 2000, you (p.45) haven't had
a work position." "Yet in your most recent academic review, you received
15    a D-plus." "In your T-A-B-E, TABE, score, your achievement level went
down."
16
Page 45: "You have been in self-help for more than ten years." "And the
17    AA 12 Step Program, I asked you Step 4 and Step 8 and you had no ability
to answer these questions." "...but the extent that you have internalized
18    and taken to heart the principles in the 12 Step and AA programs."

19    Page 45: "In regard to your parole plans, during this hearing you have
admitted making no efforts to obtain a job." "...the INS hold and (p.46)
20    deportation to Guatemala will not excuse you from establishing documented
parole plans." "...we are going to request that you establish plans to
21    become self-sufficient and demonstrate at the next Panel your personal
efforts to find a job in Guatemala." "There is no requirement that you
22    have a job offer, but efforts, however, will be assessed."

23    Page 47: "...we have concerns as to whether you really have an
understanding of the causation factors." "And for all the reasons
24    discussed, we believe that parole is not suitable at this time for you."

25    page 47: "We find that you continue to need therapy in order to face,
discuss, understand, and cope with stress in a nondestructive (p.48)
26    manner." "Until progress is made, you continue to be unpredictable and
a threat to others." "Therapy in a controlled setting is needed, but
27    motivation and amenability are questionable at this time."

28    Page 48: "...you have not been involved with a 115 and that is very rare."

11

1          "...the fact that you have not had a work position and the fact that
2    you've been in AA for 12 years, but can't talk about two of the basic
3    steps that are very important for rehabilitation, that we're going to
     have to see some effort in the next year."

4    Page 48: "I did want to make clarification that there was a certificate
     that he's a mechanic." "...you had over a six-point reading as your
5    highest."

6    Page 49: "Getting deported, we don't care where you're being released
     to."

7
     Page 20-21: "Commissioner Kubochi, states, in substance: That before
8    the Board releases a foreign national, with an INS hold, "they send
     investigators, even to foreign countries to check on what you have told
9    us in regard to your parole plans." (p.21): "Another way of saying this,
     Mr. Marroquin, is they just don't fly you over to Guatemala City and
10   just let you off the sidewalk. They actually check." (The Board has a
     misunderstanding of their power related to deportation of an inmate with
11   an "INS" hold.)

12        The Board has nothing to do with deportation to Guatemala but rather can only

13   turn over the INS held inmate to the federal authorities for deportation, and,

14   the federal authorities do not make any "checks" other than to make sure which

15   foreign country the inmate is being deported to. To believe that the Board actually

16   has someone check on a residence, job offers, etc, is absurd and ludicrous and

17   is unreasonable of belief even in a fairy tale world.

18        Petitioner asserts that, the above were the reasons/excuses for denial of

19   suitability, not for parole but for setting a term and deportation to my home

20   country of Guatemala.

21        The commitment offense and conduct prior to imprisonment (entering the U.S.

22   illegally) was also used at Petitioner's two previous hearings to deny suitability.

23   The denial of parole (which can never take place, i.e., "INS" hold), regardless

24   of Petitioner's 20 plus years of incarceration (inclusive of earned credits), and

25   evidence of rehabilitation, "12 years of attending AA, in self-help for more than

26   10 years" and his consistent attempts at bettering himself through Adult Basic

27   Education even with an obvious learning disability, his remorse, his perfectly

28   clean prison record of "no" CDC-115 rules violations write ups he still is denied

1  deportation through suitability based on unchanging events in violation of due

2  process and 'some evidence' of a current threat or risk to society.

3  ## CONDUCT PRIOR TO IMPRISONMENT

4  The Board has, on the last 3 denials, based their pre-determined denial on

5  the fact that Petitioner entered the United States, in 1974, illegally (true and

6  admitted) he worked for a living eventually starting his own business in Marble,

7  he never had a 'run in' with law enforcement and supported himself and his family.

8  Other than the illegal entry into the United States, and, the commitment offense

9  he was a law abiding person.

10  As the recent Court of Appeals in, In re Scott, 133 Cal.App.4th 573, 34

11  Cal.Rptr.3d 905 (2005) regarding the continuous use of conduct prior to imprisonment

12  wrote:

13  "The Governor's assumption that a prisoner may be deemed unsuitable for
14  release on the basis of the commitment offense 'alone' is correct,
     (Rosenkrantz, 29 Cal.4th at p.682), but the proposition must be properly
15  understood. The commitment offense is one of only two factors indicative
     of unsuitability a prisoner can not change (the other being his 'previous
16  record of violence'). Reliance on such an immutable factor 'without regard
     to or consideration of subsequent circumstances' may be unfair (In re
17  Smith, (2003) 114 Cal.App.4th 343, 372), and 'runs contrary to the
     rehabilitative goals espoused by the prison system and could result in
18  a due process violation.' (Biggs v. Terhune, 334 F.3d at p.917). The
     commitment offense can negate suitability only if the circumstances of
19  the crime reliably established by evidence in the record rationally
     indicate that the offender will present an unreasonable public risk if
20  released from prison. Yet, the predictive value of the commitment offense
     may be very questionable after a long period of time. (Irons v. Warden
21  of California State Prison – Solano (E.D. Cal. 2005) 358 F.Supp.2d 936,
     947, fn.2). (Id. at pp.919-920)."

22
23  "The Governor states in his decision that the gravity of Scott's offense
     is alone a sufficient basis 'on which to conclude that his release from
24  prison at this time would pose an unreasonable public risk.' "That
     statement could be repeated annually until Scott dies or is rendered
25  helpless by the infirmities of sickness or age." (Id. at pp.919-920,
     fn.9) (Emphasis added in original). "It is worth noting, as has our
26  supreme court (People v. Murtishaw (1981) 29 Cal.3d 733, 768, disapproved
     on other grounds in People v. Boyd, (1985) 38 Cal.3d 762), that a large
27  number of legal and scientific authorities believe that, even where
     passage of time is not a factor and the assessment is made by an expert,
28  predictions of future dangerousness are exceedingly unreliable." (Id.
     at p.920, fn.9); (petition for review was denied in Scott on November
     30, 2005 DJDAR 13803).)

13

1  As the above case citation 'mainly' addresses the use of 'pre-conviction'

2  violence Petitioner has no such history of violence prior to the commitment offense.

3  Regarding the commitment offense Petitioner committed over 16 years ago, this

4  passage of time was discussed in Wen Lee, 2006 DJDAR 13961, as to Mr. Lee's parole

5  denial on a conviction of "attempted premeditated murder", and, "second degree

6  murder of Mrs. Soong and two firearm enhancements" in which the court stated that:

7
          "Lee's crimes almost 20 years ago have lost much of their usefulness
8          in foreseeing the likelihood of future offenses than if he had committed
           them five or ten years ago. (In re Scott, supra, 133 Cal.App.4th 573,
9          595 [past crime's value for predicting future crime diminishes over
           time])." (Id. at 13964-13965).

10  In In re Shaputis, 37 Cal.Rptr.3d 324, 135 Cal.App.4th 217 (2000), relying

11  on Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003), which is another post

12  Dannenberg case, wrote:

13
          "[A]lthough reliance on conduct prior to imprisonment to justify denial
14         of parole can be initially justified as fulfilling the requirements by
           state law, where an inmate over time continues to demonstrate exemplarly
15         behavior and evidence of rehabilitation, denying him a parole date simply
           because of the nature of prior conduct would raise serious questions
16         involving his liberty interest in parole." (Id. at p.335, citing also,
           Irons v. Warden of California State Prison - Solano (E.D. Cal. 2005)
17         358 F.Supp.2d 936, 947.)

18  Shaputis held that reliance on a parole applicant's "former life style" prior

19  to imprisonment to deny parole, that such reliance on such an "historical relic"

20  is an "arbitrary and capricious [decision] within the differential standards

21  articulated by Rosenkrantz, supra, 29 Cal.4th 616." (Shaputis, 37 Cal.Rptr.3d at

22  335; Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 2006 WL2327085 at *15 (C.D. Cal.

23  2006) [citing Shaputis for the same proposition]).

24  Even the Court in In re Rosenkrantz, 29 Cal.4th 616 (2002), indicated that

25  the Board may not indefinitely rely on the nature of the offense to find petitioner

26  unsuitable for parole. A close examination of what the California Supreme Court

27  stated in Rosenkrantz illuminates this reasoning:

28
          "The nature of the prisoners offense, alone can constitute a sufficient

14

basis for denying parole. (In re Minnis, 7 Cal.3d 639, 647; In re Ramirez, 94 Cal.App.4th 549, 569; In re Seabock (1983) 140 Cal.App.3d 29, 36–37.) Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals whom have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant. (Rosenkrantz, 29 Cal.4th at 682–683.")

In Rosenkrantz, because he felt he was "humiliated" by a family friend, purchased an UZI and 250 rounds of ammunition, confronted his victim and shot the victim "at least 10 times", "including six wounds to the head." (Rosenkrantz, 29 Cal.4th at 628–629). After years of court litigation, the Superior Court of California for the County of Los Angeles in In re Rosenkrantz, case No. BH003529, filed June 26, 2006, released Rosenkrantz, citing that the repetitive use of the circumstances surrounding the commitment offense and conduct prior to imprisonment violated due process, writing:

"The Board's sole reliance on the gravity of the offense to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. (Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 916). However, overtime, should petitioner continue to demonstrate exemplary behavior of rehabilitation, denying a parole date simply because of the nature of the commitment offense raises serious questions involving his liberty interest in parole. (Id. at p.917)."

¶The court finds that petitioner's continual parole denials have been based mainly on the gravity of the commitment offense, the circumstances of which can never change. Therefore, the Board's continued sole reliance on the commitment offense will essentially convert petitioner's original sentence of life with the possibility of parole into a sentence of life without the possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his crime was not serious enough to warrant a denial of parole. (Irons v. Warden, (E.D. Cal. 2005), 358 F.Supp.2d 936, 947.)"

Petitioner's 'original' sentence of 15 years 'to life' plus a 3 year gun enhancement is now becoming a life without the possibility of parole term. Petitioner has served over the maximum in the Matrix, inclusive of earned credits.

The Board's continued reliance on the commitment offense, and, his illegal entry into the United States over 3 decades ago violates due process because the facts surrounding the commitment offense, and, his illegal status, do not now constitute 'some evidence' with 'some indicia of reliability' of Petitioner's

dangerousness. There is no established nexus to an unreasonable 'current' risk to the public within the intent of P.C. §3041(b). Hill, 472 U.S. at 455; Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner v. State 2004 WL1080177 *1-2 (C.D. Cal. 2004). (Id. at *16).

In the case of Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1065, 1070. The court reasoned in pertinent part: "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances – after nearly two decades of incarceration and a half dozen parole suitability hearings – violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil." (Id. at p.1084). See also, Martin v. Marshall (2006) 431 F.Supp.2d at pp.1040-1042, of which, this case involved multiple victims; Biggs v. Terhune, supra, 334 F.3d 910 (9th Cir. 2003).

Furthermore, this Petitioner's, offense is no more "callous, cold, calculated, trivial" than the following recent cases from the appellate courts of California.

In the decision by the Second Appellate Court of California, Division Eight, in the case of Wen Lee, (2006) 49 Cal.Rptr.3d 931. Lee went armed with a gun and a box of ammunition. He had decided that if Soong refused to pay, he would kill Soong and then himself. Lee drove 15 minutes to the restaurant and asked Soong for his money. Soong shook his head and said that he did not have time to talk. Lee pulled out his gun and fired five times before the gun jammed. He hit Soong twice, who survived the shooting, but one of the bullets hit Soong's wife in the head, killing her. (Note: Two (2) victims and five (5) shots fired). Lee was sentenced to second degree murder.

At pp.937-938, the court stated that: "...they were not "atrocious", or at

16

least were no more atrocious than whenever one human being kills another – and were not committed "in an especially heinous, atrocious or cruel manner." The measure of atrociousness is not notions of common decency or social norms, for by that yardstick all murders are atrocious. (See, In re Scott, supra, 119 Cal.App.4th at p.891, "All second degree murders by definition involve some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings, and suffering of others"). Rather, the inquiry is whether among murders, the one committed by Lee was particularly heinous, atrocious or cruel. (In re Ramirez (2001), 94 Cal.App.4th 549, 570, disapproved on another point by In re Dannenberg (2005), 34 Cal.4th 1061, 1082–1083, 1100). By that measure, Lee's crimes were more commonplace that egregious."

In the case of In re Jeffrey David Elkins, case No. A111925, Division Two. Elkins beat his victim to death with a baseball bat, put the body in the trunk of his car, went back to the house and took a shower, drove to the mountains and dumped the body down a steep grade, then stealing from a storage unit and his girlfriend's residence and fleeing the state.

The court concluded at 14497, that: "Given the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating factors of the crime no longer amount to "some evidence" supporting denial of parole." (Emphasis added).

Petitioner's case involves a single shot to the victim's arm, which traveled into the upper torso causing death. Contrary to the deputy district attorney's assertions, there was evidence of a broken beer bottle as trial exhibits and testimony established. There was no intent to kill as the jury returned with a verdict of second degree and not a first degree which required premeditation.

However particularly egregious (callous, cold, calculated) means nothing more than finding elements in excess of those "minimally necessary to convict." In re Dannenberg, 34 Cal.4th 1061, 1095, 23 Cal.Rptr.3d 417, 440 (2005).

Petitioner has taken responsibility for his commitment offense and has expressed remorse, even though it is what he perceived at the time, as an eminent threat to his life, he took another's life. Perception was addressed in People v. Flannel and People v. Ceja. The term 'kidnapped' is being mis-construed due to language barriers and interpretations.

In, In re Ramirez, Marin County Superior Court, case No SC10982(A) (9-13-2000), (94 Cal.App.4th 549), the court held that parole could not be withheld absent a factual finding that the offense was "particularly egregious".

There is no mention what-so-ever in the record (Ex. "A") of the words "particularly egregious", thus the Board's decision was arbitrary and capricious as there was no legitimate, logical reason, supported by 'some evidence' for the 3rd denial of a deportation date to Guatemala. Petitioner's offense fits squarely within the Board's matrix. See (Ex. "A":49), 17, 18, 19 years, inclusive of earned credits, see Proposition 7 of 1978.

## LIMITED INSTITUTIONAL PROGRAMMING

Petitioner asserts that he has 'attempted' to further, and, upgrade his education, and, while the Board condemns Petitioner for not having a "job" he cannot do the two things at once within the prison schedules. Having a "job" is not a requirement in the suitability factor.

Petitioner has attended education classes "from 2000" (Ex. "A" p.44.) And after 30 odd years in the United States Petitioner still does not have a 'grasp' of the English language sufficient enough to not require an interpreter at his hearings. Obviously Petitioner has difficulty retaining what he has learned 'but' not remembering step 4 or 8 of the twelve steps of AA does not establish a nexus to a current threat level to the public but rather a learning disability.

Under the Americans with Disabilities Act, which applies to Petitioner's "thinking, memory and lack of ability to articulate the 12 steps of AA from memory" is addressed in the following case authorities:

1

2
> E.E.O.C. v. R.J. Gallagher Co., 181 F.3d 645 (5th Cir. 1999); One does
> not have to have "some obvious specific handicap" in order to be "regarded
> as" disabled for ADA purposes.

3

4
> Taylor v. Phoenixville School District, 184 F.3d 296 (3rd Cir. 1999);
> "Thinking" is a "major life activity" under the ADA.

5

6
> McAlindin v. County of San Diego, 192 F.3d 1226 (9th Cir. 1999); Sleeping
> "interacting with others", are all "major life activities" for purposes
> of the ADA.

7     Nowhere in P.C. §3041(a)(b) is there a requirement for 'institutional

8  programming' nor is there a nexus to 'limited institutional programming' to

9  establish a current threat or risk to public safety to support the denial of

10  suitability. 'If' Petitioner had a "job" while in prison 'but' was not furthering

11  his education (as best as he can) the Board would nonetheless state some other

12  excuse for the denial.

13     There is no evidence in the record that Petitioner had difficult relationships

14  with other prisoners or prison staff. The record establishes this issue. Petitioner

15  is a model prisoner and has maintained full institutional compliance, he has

16  'diligently' attended AA for over 12 years, and he has chosen to remain free of

17  alcohol, and, he is aware of the fact that alcohol played a part in the commitment

18  offense.

19     The regulations distinguish between criminal history and social history. §2402,

20  subd. (b), with the later being defined in terms of social relationships. §2402,

21  subd. (c)(3) as distinguished from criminal activity. Apart from the commitment

22  offense there is only a 3 decades old "historical relic" issue of illegally entering

23  the United States.

24     The two factors are thus distinct and should not be conflated. Similarly,

25  while there is ample evidence that Petitioner's alcohol use contributed to his

26  commitment offense, there is no evidence that it resulted in any unstable social

27  history. See, Deluna, 126 Cal.App.4th at p.595, 24 Cal.Rptr.3d 643. Nor is there

28  any evidence in the record that Petitioner is at risk of returning to alcohol use

if he were released, after more than 16 years of sobriety and 12 years of

participation in AA. See, Smith 114 Cal.App.4th at p.372, 7 Cal.Rptr.3d 655, [if defendant's past use of drugs (alcohol) established his unsuitability for parole, "then the [Board] could deny parole for the rest of [the defendant's] life based on this immutable factor, without regard to or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs (alcohol) and that there is little current likelihood of drug (alcohol) relapse..."].) (Note* Petitioner has substituted 'alcohol' for 'drugs' in this citation).

Although the Board consistently required Petitioner to 'recite' steps 4 and 8 of the twelve step program, and, basically condemning Petitioner's 12 years in the program, a demand for such self-help was condemned in Turner v. Hickman, 342 F.Supp.2d 887 (E.D. Cal. 2004), the court held that: Requiring a California life prisoner to attend Narcotics Anonymous (NA), or, Alcoholics Anonymous (AA) as a predicate for parole constitutes a state establishment of religion prohibited by the First Amendment. Furthermore, the court enjoined the Board (BPH) from ever imposing such a requirement in the future and orders all records of past references to the prisoner's failure to attend NA (or AA) be expunged from his prison records. See also, Lee v. Weisman, 505 U.S. 577 (1992); Kerr v. Farrey, 95 F.3d 472 (7th Cir. 1996); Warner v. Orange County Dept. of Probation, 115 F.3d 1068 (9th Cir. 1997).

## CURRENT RISK TO SOCIETY, AND, SUPPORTING AUTHORITIES

The test for P.C. §3041 requirements is that of an assessment of the individual's current risk, and not just a potential or future risk. Forecasting into the far future of petitioner's violence potential has been prohibited by the California Supreme Court. See, People v. Murtishaw, (1978) 29 Cal.3d 733, 737. As in Murtishaw, the subsequent lineage of death penalty comments continue to hold that while a prosecutor's comments about future dangerousness during closing arguments are allowed, the prosecutor may not rely on a psychiatric expert's opinion

1  as to a defendant's <u>future</u> dangerousness. See, People v. McDowell, (1988) 46 Cal.3d

2  551, 571; People v. Bean, (1988) 46 Cal.3d 919; People v. Fudge, (1994) 7 Cal.4th

3  1075, 1117; People v. Medina, (1995) 11 Cal.4th 694, 767. Concluding that 'expert'

4  forecasts of future violence is notoriously unreliable, (Id., 768-769), and often

5  brand as 'dangerous' many persons who are in reality totally harmless.

6  Petitioner's 3 previous Psychological Evaluation Reports were 'all' positive

7  of release and, that Petitioner poses less of a threat than the average citizen

8  and his GAF score at his second hearing was an astounding 98.

9  "Current" suitability (danger of risk to society) is discussed in Biggs, 334

10  F.3d 15 915, 916-917; Irons, 358 F.Supp.2d at 947; Masoner, 2004 WL1080177 at *12;

11  Bair, 2005 WL2219220 at *12 fn.3; Martin, 431 F.Supp.2d at 1046-1047; Scott, 133

12  Cal.App.4th at 594-595, 34 Cal.Rptr.3d at 91-92; Shaputis, 37 Cal.Rptr. at 334-335;

13  Cf. Hending v. Smith, 781 F.2d 850 (11th Cir. 1986) ["I]t is a matter of general

14  knowledge that except for professional killers, few people commit more than one

15  murder in a life time. It is a crime involving a specific interpersonal crisis,

16  and not a habitual offense."]; Rosenkrantz, 444 F.Supp.2d 1063, 2006 WL2327085

17  at *12-17).

18  In In re Elkins, 144 Cal.App.4th 475, 487, the court concluded that: "Given

19  the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over

20  that time, continued reliance on the aggravating factors of the crime <u>no longer</u>

21  amount to "some evidence" supporting denial of parole." (Emphasis added).

22  The commitment offense can negate suitability [for parole] only if

23  circumstances of the crime rationally indicate that the offender will present some

24  evidence of the existence of a particular factor does not equate to some evidence

25  the parolee's release unreasonably endangers public safety.

26  The test is not whether some evidence supports the excuses for denying parole,

27  but whether some evidence indicates a parolee's release unreasonably endangers

28  public safety. The Lee, supra, (2006) 143 Cal.App.4th 1400, 1408, court held that"

1

"To deny parole, the reason must relate to a defendant's continued unreasonable

2

risk to public safety."

3

In In re Dannenberg, 34 Cal.4th 1061, 1095, 23 Cal.Rptr.3d 417, 440 (2005)

4

the California Supreme Court changed the standard set forth in Rosenkrantz so that

5

the BPT could find a petitioner unsuitable for parole based on the circumstances

6

of the crime so long as the violence or viciousness of the inmate's crime was "more

7

than minimally necessary to convict him of the offense for which he is confined."

8

Of course, as the dissent in Dannenberg pointed out, this standard is completely

9

unreviewable. (34 Cal.4th at 1102, 23 Cal.Rptr.3d at 446). The minimal elements

10

of the crime are simply that a person dies at the hands of another with the

11

perpetrator exhibiting the requisite intent. Any fact in addition to this could

12

be viewed as "more than minimally necessary to convict." For example, one BPT panel

13

may believe use of any weapon where death is not instantaneous, probably the vast

14

majority of murders, exhibits callousness. A conclusion can easily be reached by

15

those who want to claim that the facts of any murder are such that they prove more

16

than those facts minimally necessary for a conviction.

17

"[A]ll second degree murders by definition involve some callousness – i.e.,

18

lack of emotion or sympathy, emotional insensitivity, indifference to the feelings

19

and suffering of others'" (Scott I, 119 Cal.App.4th at p.891; In re Weider, 145

20

Cal.App.4th at p.587). Sass, 2006, DJDAR 11931 (9th Cir.).

21

The Lawrence court found that the recent interpretation of the state

22

constitution's due process "some evidence" standard prohibited the use of a

23

commitment murder as the sole basis for denying parole decades after the crime's

24

commission. Citing In re Smith, supra; In re Scott, supra; In re Lee, supra; and

25

In re Elkins, supra, the Lawrence court concluded that the "nature and age" of

26

the defendant's commitment offense failed to supply "some evidence" that she was

27

a "present threat to public safety." (In re Lawrence, WL1475283 at p.28). Lacking

28

a nexus between the defendant's present record of reform and her unsuitability

22

for parole, the Court of Appeal reversed the Governor's decision. (Id., pp.29-34).

The First District reached the same conclusion in the recent case of In re Barker, 2007 WL1502277. In Barker, the defendant participated in the 1977 killing of a friend's parents and grandfather. The defendant was 16-years-of-age at the time. The friend shot his parents and the defendant shot the grandfather, after first hitting him several times on the head with a chisel. The defendant was tried as an adult and convicted on two counts of second degree murder and one count of first degree murder. (In re Barker, ___ Cal.App.4th ___ [2007 WL1502277, at p.1].)

Decades later at the age of 47 and the defendant had been in state prison for 29 years, the Board denied him a parole suitability finding for the ninth time. In doing so, the Board disregarded that the defendant had participated in self-help programs, obtained his GED, earned 45 units of college credits, acquired several vocational skills, and had been disciplinary-free for 11 years. His September 2005 mental health evaluation confirmed earlier evaluations that his "risk for recidivism on a violent crime while in the free community is within the low range." (Ibid.) Following a brief hearing before a panel of two commissioners, the Board refused the defendant parole and deferred his next hearing for three years.

The Court of Appeal reversed the Board's decision on grounds it violated the defendant's due process rights by failing to meet the "some evidence" rule. (Ibid). In arriving at this conclusion, the court acknowledged that the Board enjoys broad discretion in making parole decisions, but admonished that the Board's discretion, while broad, is constrained by an inmate's constitutional rights of due process. (Id., at *9). Due process requires that the Board apply uniform terms for parole release decisions and set a parole release date unless it determines "that the gravity of the current convicted offense or offenses, or their timing and gravity, are such that public safety requires a more lengthy period of incarceration" (Id., at *9; In re Elkins, supra, 144 Cal.App.4th 475, 487; §3041(b).) The overarching consideration guiding the Board's decision must be public safety. (In re Barker,

23

1  supra, WL1502277, at *10; §3041(b).) The Barker Court thus held that:

2

3          "In measuring the "some evidence" standard against the defendant's prison
           record, the court concluded that insufficient evidence supported the
4          Board's findings that the defendant required additional therapy; the
           gravity of the commitment offense meant he was a danger to society; or
           that his 11 years of discipline free record showed relatively recent
5          rehabilitation." (In re Barker, supra, WL1502277, at p.12).

6          "The requirement of more therapy failed to meet the "some evidence"
           standard, because the defendant's recent psychological evaluations were
7          positive and made no such recommendation. (Ibid.) The Board's finding
           that the defendant's rehabilitation gains were recent was likewise
8          unsupported by "some evidence", as the defendant had been "disciplinary-
           free since 1995" and had taken responsibility for his crimes since at
9          least 1995 and perhaps as early as 1990. (Ibid.) Moreover, none of the
           suitability factors require that a prisoner's gains be maintained over
10         an extended period of time. (See, §2281, subd. (d) [suitability factors].)
           The Board's repeated reliance on decades old historic facts likewise
11         did not prove the defendant presently posed an unreasonable risk to public
           safety when measured against his 11 years of rehabilitation. (In re
12         Barker, supra, WL1502277, at pp.15-16.) The court, thus, concluded that
           the record failed to support the Board's conclusion that the defendant
13         was unsuitable for parole." (Id., at pp.19-20.)

14      Compare Petitioner's exemplary record, his remorse, AA attendance educational

15 efforts, three (3) positive psychological evaluation reports positive of release.

16                          **PSYCHOLOGICAL EVALUATION**

17      The Board, at (Ex. "A") page 47: "We find that you continue to need therapy

18 in order to face, discuss, understand, and cope with stress in a nondestructive

19 (p.48) manner." "Until progress is made, you continue to be unpredictable and a

20 threat to others." "Therapy in a controlled setting is needed..."

21      Despite the obvious, in support of release Psychological Evaluation the Board

22 continues to over-ride said reports and they are not legally permitted to assume

23 the role of expert witnesses and therefore cannot reassess the findings or re-weigh

24 the importance of an individually prepared and detailed report by a state licensed

25 psychiatrist/psychologist. The record (Ex. "D") is completely void of any listed

26 'expertise' regarding the Commissioners educational background or state license

27 for psychological training, or at a minimum, 'two' (2) years of "graduate training

28 in psychiatry" as is required in the Department of Corrections Operational Manual,

at §62090.14.1 which is a requirement for CDC Correctional Counselors, to be able to make an evaluation for an inmate, that gives them the 'right' or 'authority' to over-ride, or, re-weigh a legitimately prepared psychological evaluation based on a 'whim/excuse', or, when it does not support their pre-determined denial, which is almost always done by the Board when the evaluation is supportive of release.

The psychologists have cleared Petitioner (at all 3 hearings) of any need for additional therapy 'or' self-help. There must be a factual underpinning to support the Board's denial. See, In re Caswell (10-10-01) 92 Cal.App.4th 1017, 1027; In re Rosenkrantz, 80 Cal.App.4th 409; In re Ramirez, 94 Cal.App.4th 1017.

What is confounding in the record is that there is no reference to why Petitioner is dangerous to society, no nexus is established, and, the Psychological Evaluation Report (for the last 3 hearings) establishes just the opposite.

To understand the GAF 'score' of 98 simply means that in the assessment of dangerousness to re-offend, out of 100 inmates released there would be 98 inmates that would re-offend or commit another crime before Petitioner would be likely to do. This 'score' is sufficient standing alone to find Petitioner suitable for release to INS for deportation.

The psychologists have cleared Petitioner of any need for additional therapy 'or' self-help. Therefore, absent 'any' evidence standard, i.e., "some evidence" or "modicum" of evidence often held to be sufficient by the Attorney General's Office, the Board's conclusions were unsupported and therefore arbitrary and capricious. The decision to deny parole requires reversal and Petitioner should be given a deportation date, not a parole date.

### PAROLE PLANS; DEPORTATION v. PAROLE ISSUE

Petitioner is a Guatemalan national, his mother still lives there, his wife is going to move to Guatemala with Petitioner. Petitioner has an INS hold. (See, EX. "A", passim).

What has been most troubling during the three (3) hearings over the years

is that the Board had required parole plans both in California and Guatemala contrary to case authorities and California law.

Petitioner has offered proof of residence and self employment among other 'trades' that can support he and his wife in Guatemala. He also has family support and the support of his adult children living in the U.S. (Ex. "A", passim).

At Ex. "A", page 45: "In regard to your parole plans, during this hearing you have admitted making no efforts to obtain a job." At page 46: "...we are going to request that you establish plans to become self-sufficient and demonstrate at the next Panel your personal efforts to find a job in Guatemala." "There is no requirement that you have a job offer..." "...but efforts, however, will be assessed." (Emphasis added). This irresponsible hyperbole statement by the Board borders on ludicrous and just plain absurd.

It 'appears' that 'if' Petitioner writes an unknown quantity of letters to an unknown company or corporation, for an unknown position with an unknown salary, for an unknown date that a job would be available, and, requiring a potential employer who is unknown, to keep a position open for Petitioner with a possibility of hiring Petitioner at some unknown date is patently ridiculous. First, where is Petitioner going to have access to these company/corporation names, second, how is a potential employer going to interview Petitioner before he offers employment. BUT, the only recourse Petitioner appears to have is to write an unknown quantity of letters to unknown company's or corporations and that will be "assessed" by the Board and it appears that the Board will find the letters sufficient...

Petitioner asserts that, as a most basic understanding of P.C. §3041(b) (threat level to the public), in the case at bar, that when he is paroled (which cannot legally happen) he will no longer be (and never will be) turned over to the parole authorities/agent, but rather he will be turned over to the Federal Government's INS Agency, thus under a catch-22 situation, when he is paroled he will be free of parole because California and Guatemala have no treaty for parole supervision.

Thus all the criteria/excuses from the Board to further his self-help, furnish parole plans and job offers (1st and 2nd hearing required parole plans and job offers in California) in Guatemala are mere excuses under the arbitrary and capricious standard and furthermore cannot be applied to Petitioner. The Board's ridiculous and absurd statement that; Ex. "A" at page 21: "...they just don't fly you over to Guatemala City and just let you off at the sidewalk." "They actually check." (In reference to residence, job etc.). The Federal Government's INS Agency does not fly to other countries to verify residences or any other subject, nor does CDC conduct any such operations. The only criteria for Petitioner's deportation by INS is that he is going to the correct country and that he was not a political refugee and returning to Guatemala would cause death or torture to him.

It is basically understood that the reason for any inmate's denial of suitability is because of a perceived threat level or risk of danger to the public is to enhance the prisoner's sentence, given the fact that a foreign national, with an INS hold, like Petitioner, can **never** be found suitable for parole simply because he can never be paroled (only deported), §3041(b), consideration for public safety cannot be considered. In reality any foreign national, with an INS hold, that is going to be deported should be turned over to INS for deportation at his "first" hearing because subd. (b) can never be applied to the determination.

The court in U.S. v. Cuero-Flores, 276 F.3d 113 (2nd Cir. 2002), held that: when addressing a "special" parole issue: the court agreed with other circuits that have held supervised release terminates when the parolee is deported.

As far as the Federal Government's INS Agency is concerned, when the deportee is placed on the plane to his country of origin he is 'out of sight, out of mind'.

California P.C. §3041(a)(b) is unconstitutionally vague and ambiguous as to its application for foreign nationals that have an "INS" hold for deportation purposes, i.e., inmates that cannot be paroled but only deported thus the same criteria (§3041(b)) cannot be applied to both classes of inmates, U.S. citizens,

and, foreign nationals. P.C. §3041(a)(b) does not address the issue of deportation vs. parole suitability.

### CONCLUSION

Petitioner submits that his parole suitability hearing constituted a meaningless, pro forma charade, first, Petitioner cannot be found suitable for parole within the intent of §3041(b), second, the outcome was pre-ordained, and as such, deprived him of substantive and procedural due process.

It is a proper function of judicial review to ensure that the Board has honored in a "practical sense" the petitioner's right to "due consideration", also, "individualized consideration". See, Sturm, 11 Cal.3d at p.268.

In re Edward Ramirez, Court of Appeal, First Appellate District, Division Three, Case No. A092699, filed 12/12/01: The court addressed similar issues as presented herein and in the DISPOSITION the court ordered, among other orders, that: "the Board must consider Ramirez's psychological profile as a factor favoring his application for a parole date..."

Nonetheless, P.C. §3041(a)(b) is vague and ambiguous as to suitability for "deportation" vs. suitability for "parole". The criteria to favor a positive parole decision cannot apply to a foreign national (job offers, residence, local letters of support), without being in violation of the laws of California and the United States.

P.C. §3041(a)(b) are clear in their Legislative intent, for U.S. citizens that will be found suitable for "parole". The "only" criteria for a parole release date is that the inmate shall not pose an unreasonable risk of danger to society. The Board does not have the authority to make this assessment and "must" follow the evaluation prepared by the state licensed psychiatrist so authorized, by law and educational training, to make such an assessment. Additionally, the Board has no authority in penal codes or rules and regulations to find a 'foreign national' (that has an INS hold for deportation) suitable for parole but can only set a term

at his first/initial hearing for deportation.

Petitioner asserts that his MEPD for a sentence of second degree murder has lapsed, he is beyond, by several years, the Matrix (Ex. "A", page 49; "17, 18, 19 years") inclusive of earned credits, his last three psychological evaluation reports were all positive of release (for deportation) and that he would not pose an unreasonable (current) threat or risk to public safety. No contrary evidence exists, and Petitioner has a vested liberty interest in being deported protected by due process and equal protection that required the Board to find him suitable and set his term for deportation at his first/initial hearing as §3041(a)(b) cannot be applied to him under the 'vague and ambiguous' doctrine, as set forth herein.

Petitioner was entitled to a term setting under his equal protection "class of one" claim as there is a separate and distinct treatment established in the claim. (See, CLAIM NUMBER TWO (II).)

Because the Board's recitation of form/rote language to deny a release date was contrary to U.S. Supreme Court law, their conclusion was inapposite to the record and unsupported by any evidence standard whatsoever, denial of suitability for release for deportation on that basis denied Petitioner his due process and equal protection rights.

Because the Board's grounds/excuses for its decision to deny release for deportation, their boilerplate phrases and adjectives, were unsupported by any evidence, unsupported by the record, applicable to all such offenses, irrelevant to suitability for deportation, and/or arbitrary in the extreme, and because the Board did not determine and could not have found any evidence supporting a notion that Petitioner's offense "was carried out in a callous manner" (Ex. "A" page 43) compared to other life offenses such as Rosenkrantz and Leslie Van Houten, the denial of Petitioner's release for deportation based on the unchanging factors of his offense and his three decades old historic relic of entering the United States illegally, has abrogated his right to due process and equal protection and

his liberty interest in release for deportation, and, has converted his sentence to life without the possibility of parole because he can never be found suitable for parole within the Legislative intent of P.C. §3041(a)(b).

### RECIDIVISM STUDIES

"Studies of parole success repeatedly indicate that those who commit murder are among the best parole risks." Allen, Eldridge and Latessa, Vito, Probation and Parole in America, p.254, 1985, citing Niethercut, 1972. Both with regard to the commission of felonies in general and the crime of homicide, no other offender has such a low rate of recidivism. Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, 1980. "Paroled murderers actually present some of the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, 1980, citing NCCD newsletter, Uniform Parole Reports, 1972, p.2. "Compared with other groups, murderers are actually the best parole risks." Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., p.180, n.3, citing Stanton p.149, 1969. Two studies indicated that only three (3) in 10,000 and six (6) in 10,000 convicted of murder commit another crime. Bedau, Hugo Adams, The Death Penalty in America, 3rd Ed., pp.176-179, 1980. After conducting a study for the California Board of Prison Terms (1983-1987) it was concluded that no one released after committing a murder had been returned to prison for murder. Ellwood, Eldridge T., PH.D., Research Projects On Life Prisoners, p.3, April 1989, California BPT. "As a matter of statistical probability, murderers released from a prison are far less likely to commit a new crime than any other category of offender." Orland, Leonard, Justice, Punishment, Treatment, p.425, 1973. "Many murderers could be released immediately after conviction with little likelihood of offending again." Von Hirsh, Andrew, Doing Justice, Report On The Committee For The Study Of Incarceration, p.126, 1976. These authorities, from some of the most respected sociologists in our country, reveal the fallacy of <u>assumptions</u> regarding the dangerousness of those convicted of murder.

**PRAYER**

Wherefore, Petitioner respectfully requests that this Honorable Court declare/order that;

1). Penal Code §3041(a)(b) does create a protectable liberty interest at a parole suitability hearing for an expectant release date:

2). Respondents show cause why Petitioner is not entitled to the relief requested:

3). The BPH set a release date consistent with Petitioner's MEPD as is established in P.C. §3041(a):

4). The language in P.C. §3041(a) is the only true and constitutionally legal requirement for a parole release date consideration:

5). Petitioner be given a new parole suitability hearing that is fair, unbiased and meaningful under due process of law:

6). Petitioner's conviction must be proven to be "particularly egregious", under the standard of "special circumstances" before the BPH can apply subdivision (b) of P.C. §3041:

7). The BPH's conclusions are arbitrary and capricious against Petitioner:

8). That the Board set Petitioner's prison sentence (term), by the Matrix, as was done for Schiold, as is claimed by Petitioner:

9). That Petitioner be given an evidentiary hearing to establish how many other cases where the State set the term for other life prisoners and thus further violated the Fourteenth Amendment of the U.S. Constitution:

10). If the BPH does not set a parole release date for Petitioner, that this Honorable Court, under the U.S. Supreme Court's Constitutional grant of power, issue an order for Petitioner's release on parole forthwith:

11). Grant Petitioner such other relief as this Court deems just and proper in the interest of justice as Petitioner is a layman at law.

//

Respectfully submitted,

6-17-2008

Marco Marroquin

31

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

# EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number H-62380
                           )
MARCO MARROQUIN            )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 25, 2007

1:35 P.M.


PANEL PRESENT:

A. Stanley Kubochi, Presiding Commissioner
David Yacono, Deputy Commissioner

OTHERS PRESENT:

Candice Christensen, Attorney for Inmate
Lawrence Morrison, Deputy District Attorney
Jose Zavala, Interpeter
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No    See Review of Hearing
_____ Yes   Transcript Memorandum


**GITA SCHMITZ**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

INMATE

INDEX

                                                                 Page

Proceedings ............................................... 1

Case Factors .............................................. 9

Pre-Commitment Factors ................................... 15

Post-Commitment Factors .................................. 16

Parole Plans ............................................. 19

Closing Statements ....................................... 34

Recess ................................................... 42

Decision ................................................. 43

Adjournment .............................................. 50

Transcriber Certification ................................ 51

--oOo--

1

```
 1        P R O C E E D I N G S

 2        PRESIDING COMMISSIONER KUBOCHI:  We are convening

 3    the Subsequent Parole Consideration Hearing for Marco

 4    Marroquin, last name is M-A-R-R-O-Q-U-I-N, CDC Number

 5    H-62380.  We will indicate that today's date is July 25ᵗʰ,

 6    2007, and it's about 1:35 p.m. and we're located at

 7    Correctional Training Facility in Soledad, California.

 8    These proceedings will be interpreted by an interpreter.

 9    Mr. Zavala, please identify yourself, spell your last

10    name.

11        INTERPRETER ZAVALA:  Jose Zavala, Z-A-V-A-L-A.

12        PRESIDING COMMISSIONER KUBOCHI:  Thank you.  Will

13    you please raise your right hand?  Do you swear or affirm

14    to translate truthfully and accurately to the best of

15    your ability from English to Spanish and from Spanish

16    into English?

17        INTERPRETER ZAVALA:  I do.

18        PRESIDING COMMISSIONER KUBOCHI:  Thank you very

19    much.  Mr. Marroquin, we will identify ourselves by voice

20    and I will state my name, spell my last name, go around

21    the table, and when it's your turn, please state your

22    name, spell you last name.  Your CDC number is H-62380?

23        INMATE MARROQUIN THROUGH INTERPRETER:  That's

24    correct.

25        PRESIDING COMMISSIONER KUBOCHI:  My name is Stan
```

2

1 . Kubochi, K-U-B-O-C-H-I, Commissioner.

2          **DEPUTY COMMISSIONER YACONO:** And I am David

3    Yacono, that's Y-A-C-O-N-O, Deputy Commissioner.

4          **DEPUTY DISTRICT ATTORNEY MORRISON:** Lawrence

5    Morrison, M-O-R-R-I-S-O-N, Los Angeles District Attorney.

6          **ATTORNEY CHRISTENSEN:** Candice Christensen,

7    C-H-R-I-S-T-E-N-S-E-N, attorney for Mr. Marroquin.

8          **INMATE MARROQUIN THROUGH INTERPRETER:** My name is

9    Marco Marroquin, H-62380.

10         **PRESIDING COMMISSIONER KUBOCHI:** Thank you.

11   Mr. Marroquin, I have placed before you a form called the

12   BPH-1073 and because you require the assistance of a

13   Spanish interpreter I'm not going to ask you to read that

14   form. However, I do note your signature and it was from

15   February 7th, 2007. Your correctional counselor at that

16   time was named Verdesoto, V-E-R-D-E-S-O-T-O, and

17   Correctional Counselor Verdesoto reviewed your Central

18   File and the correctional counselor was looking to see if

19   you had any physical disabilities and, other than your

20   request for a Spanish interpreter, Correctional Counselor

21   Verdesoto checked the box stating that there were no

22   indications of any physical disabilities that could

23   interfere with your ability to proceed with this parole

24   suitability hearing. I'm going to ask you a few follow-

25   up questions. Other than a Spanish interpreter, do you

3

1    need any assistance for this hearing?

2            **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

3            **PRESIDING COMMISSIONER KUBOCHI:**  You do not have

4    any significant hearing problems?

5            **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

6            **PRESIDING COMMISSIONER KUBOCHI:**  I see that you

7    brought reading glasses.

8            **INMATE MARROQUIN THROUGH INTERPRETER:**  Yes,

9    exactly.

10           **PRESIDING COMMISSIONER KUBOCHI:**  Because our forms

11   are in English, I do not believe that this Panel will ask

12   you to review any documents, unless they are interpreted

13   into Spanish, and I'm not aware of any, so I don't see

14   the need for you to put on your reading glasses.  Are you

15   in any physical pain as you sit there now?

16           **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

17           **PRESIDING COMMISSIONER KUBOCHI:**  Do you have any

18   physical disabilities that you would like to tell us

19   about?

20           **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

21           **PRESIDING COMMISSIONER KUBOCHI:**  In the last two

22   weeks, have you consumed any substance that could

23   interfere with your ability to think clearly today?

24           **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

25           **PRESIDING COMMISSIONER KUBOCHI:**  What is the

4

1   highest level of reading and comprehending English that

2   you have obtained before today's hearing?

3           **INMATE MARROQUIN THROUGH INTERPRETER:** I don't

4   know what to call it, but I'm in what they call the AB-3

5   class.

6           **PRESIDING COMMISSIONER KUBOCHI:** Yes, and they

7   have Adult Basic Education?

8           **INMATE MARROQUIN THROUGH INTERPRETER:** Perfect,

9   yes.

10          **PRESIDING COMMISSIONER KUBOCHI:** Those are classes

11  headed toward a GED?

12          **INMATE MARROQUIN THROUGH INTERPRETER:** Correct.

13          **PRESIDING COMMISSIONER KUBOCHI:** As I've

14  indicated, I doubt that we will ask you to read any

15  documents. Do you want it slower?

16          **INTERPRETER ZAVALA:** No.

17          **PRESIDING COMMISSIONER KUBOCHI:** Okay. Do you

18  believe that you will be able to understand the

19  proceedings here this afternoon?

20          **INMATE MARROQUIN THROUGH INTERPRETER:** Yes.

21          **PRESIDING COMMISSIONER KUBOCHI:** Counsel, having

22  met with your client in preparation for today's hearing,

23  are there any questions or topics beyond those that have

24  been discussed up until this point?

25          **ATTORNEY CHRISTENSEN:** No, none.

5

1     **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  Mr.

2    Marroquin, this hearing is being conducted pursuant to

3    the Penal Code and the rules and regulations of the Board

4    of Parole Hearings in regard to suitability hearings for

5    life inmates.  The purpose of today's hearing is to once

6    again consider your suitability for parole.  In doing so,

7    I will discuss with you your personal and social history

8    before your imprisonment.  We will consider the number

9    and the nature of the crimes for which you were

10    committed.  Commissioner Yacono will be discussing with

11    you your behavior and programming since your commitment

12    that includes participation in academics, vocation

13    training, work assignments, and group therapy, as well as

14    the evaluations of mental health experts.  I will be

15    discussing with you your parole plans, if released.  At

16    any time during this hearing, if you think of any

17    documents or any paperwork that you believe support a

18    finding of suitability, bring that material to the

19    attention of Ms. Christensen for presentation on your

20    behalf.  We will reach a decision today and inform you

21    whether or not we find you suitable for parole and the

22    reasons for our decision.  If you are found suitable for

23    parole, the length of your confinement will be explained

24    to you.  Before we recess for deliberations, the Panel

25    may ask you questions about any of the topics discussed

6

1    during this hearing. The District Attorney's
2    Representative is permitted to ask questions of this
3    Panel. Your answers to those questions will be made to
4    the Panel. Ms. Christensen will be permitted to ask
5    questions and, before recessing for deliberations, we
6    will receive a final statement from the District
7    Attorney. Ms. Christensen will tell us why you are
8    suitable for parole today and you will be given an
9    opportunity to tell us why you feel you're suitable for
10   parole. We will then recess, clear the room, and
11   deliberate. Once we have completed our deliberations, we
12   will resume the hearing and announce our decision. The
13   California Code of Regulations states that regardless of
14   time served, a life inmate shall be found unsuitable for
15   and denied parole if, in the judgment of the Panel, the
16   inmate would pose an unreasonable risk of danger to
17   society if released from prison. You have certain
18   rights. These rights include timely notice of this
19   hearing. Did your correctional counselor give you notice
20   that you were having a parole hearing?

21             **INMATE MARROQUIN THROUGH INTERPRETER:** Correct.
22             **PRESIDING COMMISSIONER KUBOCHI:** You also have the
23   right to review your Central File. Did your parole
24   officer talk to you about your right to review your
25   Central File?

7

1          **INMATE MARROQUIN THROUGH INTERPRETER:**  Correct.

2          **PRESIDING COMMISSIONER KUBOCHI:**  Were you given an

3  opportunity to review your Central File?

4          **INMATE MARROQUIN THROUGH INTERPRETER:**  Yes.

5          **PRESIDING COMMISSIONER KUBOCHI:**  You have an

6  additional right to have your case heard by an impartial

7  Panel.  Are you prepared to proceed this afternoon?

8          **INMATE MARROQUIN THROUGH INTERPRETER:**  Correct.

9          **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Marroquin, we

10  will reach a decision today.  You will be given a written

11  copy of the decision.  The decision becomes final within

12  120 days.  As to any questions about your rights,

13  including your right of appeal, please ask your attorney,

14  Ms. Christensen, who is an excellent attorney.  She's

15  very knowledgeable about all of your rights.  This is a

16  Subsequent Parole Consideration Hearing and you are not

17  required to admit or discuss the crime that resulted in

18  your life commitment.  However, this Panel does accept as

19  true the findings of the Los Angeles County Superior

20  Court.  In our Board Report, it appears that you were

21  received into Department of Corrections from a conviction

22  in Los Angeles County.  The court case was TA016787.  You

23  were convicted of Penal Code Section 187, which is Murder

24  in the Second Degree.  In addition, you were found to

25  have used a firearm within the meaning of Penal Code

8

1    Section 12022.5.  You received a sentence of 18 years to

2    life that began on December 24th, 1993.  Your minimum

3    eligible parole date was December 24th, 2003.

4    Commissioner Yacono, will this Panel consider any

5    confidential material in reaching a decision today?

6            **DEPUTY COMMISSIONER YACONO:**  No, sir.

7            **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Marroquin, I

8    have passed a Hearing Checklist to your attorney and what

9    that checklist does is it guarantees you the fact that

10   whatever I have about you, the crime, and your personal

11   and social history has been shared with Ms. Christensen.

12   I don't have any material that hasn't been given to your

13   attorney.  That will be Exhibit 1.  Ms. Christensen, are

14   there any preliminary objections?

15           **ATTORNEY CHRISTENSEN:**  No, there are not.

16           **PRESIDING COMMISSIONER KUBOCHI:**  And is your

17   client going to talk about the life crime with this

18   Panel?

19           **ATTORNEY CHRISTENSEN:**  Yes, he will.

20           **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Marroquin,

21   please raise your right hand.  Do you solemnly swear or

22   affirm that the testimony that you give at this hearing

23   will be the truth, the whole truth, and nothing but the

24   truth?

25           **INMATE MARROQUIN THROUGH INTERPRETER:**  Correct.

9

```
 1      PRESIDING COMMISSIONER KUBOCHI:  I'm going to put
 2    a brief statement of facts on the record, followed by a
 3    discussion with you of your personal and social history
 4    before your incarceration.  At around 10:00 p.m. -- and
 5    I'm looking at the Appellate Decision on Page 2 -
 6              "At around 10:00 p.m. on January 12, 1992,
 7          Mr. Marroquin and another man entered --"
 8    and I've got to spell this out --
 9          "-- Capital L-A, capital B-A-J-A-D-I-T-A,
10          LaBajadita Bar in Compton.  Before entering,
11          the security checked the two men for weapons
12          and found none.  A little later, Silva also
13          entered the bar, but did not sit with Mr.
14          Marroquin.  Both men ordered beer.  None of
15          the personnel at the bar recall seeing any
16          argument between Mr. Marroquin and Silva or
17          even seeing men approach each other while
18          inside the bar.  Before January 12, 1992 --"
19    And I'm going back to Page 2 of the Appellate Opinion.
20          "-- the evidence established that in August of
21          1991, Luis Silva and his girlfriend, Delcia Lopez,
22          D-E-L-C-I-A, last name is L-O-P-E-Z, agreed to buy
23          a car from Mr. Marroquin.  Silva drove the car for
24          several days and after discovering that it had
25          quote, a lot of defects, unquote, he returned the
```

10

1          keys to Mr. Marroquin.  Marroquin did not want the

2          keys back and told Silva that he wanted $1,000.00

3          for the days the car was used.  Silva replied that

4          if he had had the $1,000.00, he would pay him for

5          the car.  Mr. Marroquin told Silva that he would,

6          quote, he would regret what he had done to him,

7          unquote."

8    Going back to the events on January 12, 1992,

9          "At some point, Silva left the bar to move

10         his car which was blocking a driveway.

11         Several minutes later, Marroquin also left.

12         About ten minutes later, Marroquin and his

13         companion tried to reenter the bar, but were

14         stopped by the security guard because

15         Marroquin was carrying a gun.  Both men then

16         walked away to about three car lengths from

17         the bar's entrance.  Meanwhile, Silva

18         crossed the street and was walking towards

19         the bar when Marroquin approached him and

20         began yelling obscenities and vulgarities at

21         him.  Marroquin told him he had to pay for

22         the car and that he really wanted to kill

23         him.  Silva did not reply when he was being

24         yelled at and he did not have anything in

25         his hands.  Silva finally told Mr. Marroquin

11

1      that he did not want to have any problems

2      with him.  Marroquin called Silva a, quote,

3      son of the big whore, unquote, took a gun

4      from his waistband and said, quote, I'm a

5      real man and you're the type of guy that I

6      would like to put a bullet through.  I'm

7      going to kill you, end quote.  Appellant,

8      Mr. Marroquin, then pulled back the slide of

9      the gun and pulled the trigger, but it did

10     not fire.  He then pulled the slide back a

11     second time and shot Silva, who was about

12     two feet away, in his side.  Silva bent over

13     and the security guard placed him in the

14     front of the doorway.  The bullet --" in a

15     footnote, "-- entered and exited Silva's

16     upper arm, then entered the abdominal cavity

17     causing his death.  Silva said nothing."

18     Another footnote, "Maria Gutierrez,

19     G-U-T-I-E-R-R-E-Z, who was selling hotdogs

20     from a stand outside the bar, heard

21     Marroquin swearing at Silva and saying that

22     he wanted to kill him.  She did not see any

23     fight between Marroquin and Silva before

24     Marroquin pulled out the gun.  She saw no

25     menacing gestures on the part of Silva, nor

12

1          did she see anything in Silva's hands.  She
2          did not see or hear Silva break a bottle or
3          use a bottle in a jabbing motion.  The
4          security guard also did not hear any glass
5          breaking.  Marroquin and his companion
6          turned and walked away.  The security guard
7          and the manager of the bar ran up to several
8          officers in a patrol car and directed them
9          to where Marroquin was standing by a pickup
10         truck with the gun still in his hand.  The
11         officers held Marroquin at gunpoint and
12         ordered him to drop the gun.  Marroquin
13         complied with the officers' orders and threw
14         his gun into a vacant lot.  No weapons were
15         found around Silva or in his clothing.
16         There were no broken bottles around him
17         either.  Marroquin told the officer that he
18         had had an argument with Silva in the bar
19         and Silva threatened to, quote, kick his
20         ass, end quote.  Out of fear, he went to his
21         truck and got his gun.  As he returned to
22         the bar, Silva came out and again began
23         arguing with him.  He then pulled out his
24         gun and shot Silva.  Marroquin testified
25         that when Silva reentered the car he was

13

```
 1    buying from him, Silva then threw the keys
 2    at his face and refused to pay Marroquin any
 3    money for the time he had used the car.  The
 4    night of the shooting, Marroquin was sitting
 5    in the bar with his friend, Hank Floyd, when
 6    Silva came up and told Floyd to, quote, stop
 7    talking to trash, end quote, referring to
 8    Marroquin.  Silva then picked up Marroquin
 9    by his collar.  Floyd told Silva not to
10    fight in the bar and Silva replied, quote,
11    then tell him to go outside if he's a man,
12    end quote.  Silva pushed Marroquin and said,
13    quote, let's go out, faggot, end quote.
14    Outside the bar, Floyd stood between the two
15    men and prevented them from fighting.  As
16    Marroquin walked towards his car intending
17    to leave, Silva came at him with something
18    in his right hand that Marroquin thought was
19    a knife.  Marroquin kicked Silva's hand and
20    Silva turned and ran away.  Believing that
21    Silva had tried to kill him, he took his gun
22    out of his truck and loaded it.  He then saw
23    Silva's car drive away.  As Marroquin was
24    returning to the bar, Silva drove by him and
25    challenged him to fight.  Silva then made a
```

14

1       U-turn, and after parking on the opposite

2       side of the street, ran towards Marroquin.

3       As he approached Marroquin, Silva reached

4       down and broke a bottle he was holding by

5       the neck.  He tried to attack Marroquin

6       several times with the bottle, but Marroquin

7       was able to jump out of the way.  Marroquin

8       finally took a half-step back, and as Silva

9       lunged at him with the broken bottle, he

10      shot.  Marroquin denied trying to reenter

11      the bar and stated he was not frisked for

12      weapons and told not to go in.  Los Angeles

13      County Deputy Sheriff Ronald Reynolds

14      testified that on the night of the shooting,

15      Guadalupe Suazo, S-U-A-Z-Q, the bar manager,

16      told him he had seen Marroquin and Silva

17      argue for a minute inside the bar.  Bertha

18      Angeli, A-N-G-E-L-I, the owner of the bar,

19      also indicated to him that she saw Marroquin

20      and Silva arguing in the bar.  Victor

21      Matute, M-A-T-U-T-E, testified that between

22      11:00 p.m. and midnight on January 12th,

23      1992, he arrived at the bar and saw three

24      people arguing in front of the bar.  Two of

25      the people were, quote, looking to hit one

15

```
1           person, unquote, one person also had
2           something like a bottle in his hand and was
3           trying to hit the other person.  The other
4           person appeared to be trying to avoid being
5           hit and did not want to fight.  Matute then
6           heard a shot and one person fell.  Matute
7           got in his car and left."
```

8    In regard to your personal and social history, you were

9    born on July 30, 1956, and that would be about 35 years

10   old at the time of the crime.  And your father was Roman

11   and your mother was Maria.  You were born in Guatemala.

12   You had two sisters and three brothers.  Three of your

13   brother or sisters are living in the Los Angeles area.

14   The remaining two are in Guatemala.  You married Lilly

15   Espina, E-S-P-I-N-A, on August 24, 1977, and you had three

16   children together.  Mr. Marroquin, who visits you at this

17   facility?

18        **INMATE MARROQUIN THROUGH INTERPRETER:**  All of my

19   family.

20        **PRESIDING COMMISSIONER KUBOCHI:**  Well, good.  And

21   you are still married to Lilly?

22        **INMATE MARROQUIN THROUGH INTERPRETER:**  Yes.

23        **PRESIDING COMMISSIONER KUBOCHI:**  And your children

24   must be pretty grown up by now.

25        **INMATE MARROQUIN THROUGH INTERPRETER:**  Correct.

16

1      **PRESIDING COMMISSIONER KUBOCHI:** And what is the
2   youngest?

3      **INMATE MARROQUIN THROUGH INTERPRETER:** The
4   youngest is in his 20's.

5      **PRESIDING COMMISSIONER KUBOCHI:** And the oldest?
6      **INMATE MARROQUIN THROUGH INTERPRETER:** Twenty-
7   nine, 30 or so.

8      **PRESIDING COMMISSIONER KUBOCHI:** Thank you. At
9   this time, I'm going to ask Commissioner Yacono to discuss
10   your behavior since you were sent to State Prison.

11      **DEPUTY COMMISSIONER YACONO:** Okay, Mr. Marroquin,
12   we are going to cover the period since your last hearing,
13   which was June 6th of 2006, knowing that you were denied
14   parole for a period of one year at that time. Also to go
15   back, the prior hearing your initial, November 21, 2002,
16   at which time parole was denied for a period of three
17   years. The documents reviewed for this part come from the
18   Central File, Life Prisoner's Evaluation Report prepared
19   for the June of 2007 calendar by Correctional Counselor T.
20   Verdesoto, V-E-R-D-E-S-O-T-O, signed 3/23 of '07. The
21   same counselor also prepared the post-conviction progress
22   reports that cover the period of April 2006 through the
23   signature date, the same as March 27 of '07. A
24   Psychological Evaluation was prepared by Dr. McCumber
25   (phonetic) signed 5/11 of 2006 for the January of 2006

17

1   calendar. And the last Board recommended that you remain
2   disciplinary free, participate self-help, and obtain
3   positive chronos. Note that your classification is 19,
4   the minimum for your life crime, and you're currently in
5   general population, Medium-A custody level. You've been
6   at CTF since May of 1998. No enemies noted at this point,
7   no gang affiliation. A vocational certificate of
8   completion as a Diesel Mechanic is noted by a chrono of
9   August the 17th, 2005. Regarding academic education, the
10  Adult Basic Education III, which began October of 2002,
11  for this period we are showing a December -- I'm sorry, we
12  are showing a September 30th of 2006, noting a B grade and
13  a satisfactory plus behavior rating, and a December 31st
14  of 2006 B-minus and a satisfactory-plus rating, and then
15  the last is April 5th of '07, a D, David, plus and a
16  satisfactory-plus behavior rating. No work ever, no
17  psychiatric treatment. I'll come back to the psych eval.
18  No participation in self-help, there is notation of
19  beginning participation in AA meetings back in '95, for
20  this timeframe beginning April 5th of '06, July 14th of
21  '06, October 4th of '06, January 2nd of '07, and April 4th
22  of '07. There is a notation that you are on the waiting
23  list for Alternative to Violence Program since November
24  28th of '06, and that chrono was from 2/7 of '07, so we
25  know you're trying to get in that. In regards to

18

 1   disciplinaries, you now have three 128s.  The last was May

 2   31st, 2007 for altering State property, specifically a

 3   sheet.  Then prior to that, you had two 128s June 13th of

 4   '93 and June 17th of '93, delaying lock-up and window

 5   covering.  No 115s.  And then our psychiatric, noting a

 6   diagnostic impression, Axis I no clinical disorder; Axis

 7   II, no personality disorder; Axis III, no physical

 8   disorder; Axis IV, life term incarceration; and Axis IV,

 9   current global assessment of functioning is 85.  Under the

10   assessment of dangerousness, noting that Mr. Marroquin has

11   never received any serious disciplinaries and, in

12   comparison to other inmates, his potential for dangerous

13   behavior is below average.  Potential for dangerous

14   behavior in a community is a very low-risk level.  As a

15   result, he poses no more risk to society than the average

16   citizen in the community.  At this point in his life,

17   there are no significant risk factors in this case.

18   Noting under clinical observation, no mental or emotional

19   problems.  And primarily Spanish-speaking.  Will be

20   returned to Guatemala, a family home available to him, and

21   their assistance.  Plans on buying a truck, maintaining

22   it, married and the wife also plans to go to Guatemala.

23   So prognosis for successful adjustment in the community is

24   very good and then signed by Dr. McCumber.  Okay, so, Mr.

25   Marroquin, do you have any additional documents that you

19

1    wish to present?

2        **INMATE MARROQUIN THROUGH INTERPRETER:**  I do have

3    something here, but it's for my conclusion.

4        **DEPUTY COMMISSIONER YACONO:**  Okay.  Counsel?

5        **ATTORNEY CHRISTENSEN:**  No.

6        **DEPUTY COMMISSIONER YACONO:**  Commissioner?

7        **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Marroquin,

8    you have parole plans of living with your wife in

9    Guatemala City, Guatemala?

10       **INMATE MARROQUIN THROUGH INTERPRETER:**  That's

11   correct.

12       **PRESIDING COMMISSIONER KUBOCHI:**  And that you're

13   going to seek employment as a diesel mechanic.

14       **INMATE MARROQUIN THROUGH INTERPRETER:**  That's

15   correct.

16       **PRESIDING COMMISSIONER KUBOCHI:**  Have you

17   contacted any companies in Guatemala?

18       **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

19       **PRESIDING COMMISSIONER KUBOCHI:**  Why not?

20       **INMATE MARROQUIN THROUGH INTERPRETER:**  Not

21   precisely with companies, but my plans -- my life plans

22   are to set up a shop over there.

23       **PRESIDING COMMISSIONER KUBOCHI:**  And where are you

24   going to get the money to do this, Mr. Marroquin?

25       **INMATE MARROQUIN THROUGH INTERPRETER:**  Well, in

20

1    this case, you don't need a lot of money. But I do have

2    the assistance and the support of my family.

3              **PRESIDING COMMISSIONER KUBOCHI:** I understand.

4              **INMATE MARROQUIN THROUGH INTERPRETER:**

5    Specifically speaking, my children.

6              **PRESIDING COMMISSIONER KUBOCHI:** Mr. Marroquin,

7    let me tell you how the parole process works. If the

8    Board of Parole grants a hearing and grants a parole and

9    you are set free, there's a process before they set you

10   free that they send investigators, even to foreign

11   countries to check on what you have told us in regard to

12   your parole plans. In regard to your employment plans, if

13   you plan to open up a company, they will check with your

14   family to see how much money is available. If there's not

15   any money available, you would be found to not have any

16   adequate employment plans. And what that does is that

17   means that the decision to parole you is taken back to the

18   Board of Parole Hearings. It's very important for you to

19   have paperwork in regard to your employment plans. If it

20   means opening up a business, your family members are going

21   to have to have documentation that they can afford to give

22   you that financial support.

23             **INMATE MARROQUIN THROUGH INTERPRETER:** Correct.

24             **PRESIDING COMMISSIONER KUBOCHI:** Do you understand

25   that?

21

1      **INMATE MARROQUIN THROUGH INTERPRETER:**  Yes, I

2   understand.

3      **PRESIDING COMMISSIONER KUBOCHI:**  Another way of

4   saying this, Mr. Marroquin, is they just don't fly you

5   over to Guatemala City and just let you off at the

6   sidewalk.  They actually check.  Commissioner, do you have

7   any questions on any topics that have been discussed so

8   far?

9      **DEPUTY COMMISSIONER YACONO:**  No, sir.

10      **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Marroquin, at

11   this time I'm going to ask the District Attorney's

12   representative if there are any questions of the Panel.

13   And the reason I say that, is it's followed by questions

14   from your attorney, and then we go into final statements.

15   You are the last person to talk to us before we go into

16   recess for deliberations.  Okay, Mr. Morrison, do you have

17   any questions of the Panel?

18      **DEPUTY DISTRICT ATTORNEY MORRISON:**  Just a couple,

19   please.  Does the inmate consider alcohol as a major

20   factor in shooting Mr. Silva?

21      **INMATE MARROQUIN THROUGH INTERPRETER:**  Not

22   precisely the fact of shooting at him, but it was the

23   cause of my disgrace.

24      **DEPUTY DISTRICT ATTORNEY MORRISON:**  Did the inmate

25   know what he was doing?  Was he in control of his

22

1   faculties?

2       **INMATE MARROQUIN THROUGH INTERPRETER:** Well, my

3   life was in the middle.

4       **DEPUTY DISTRICT ATTORNEY MORRISON:** Did the inmate

5   have to wrack the gun twice before he shot it?

6       **INMATE MARROQUIN THROUGH INTERPRETER:** I don't

7   understand, how do you mean?

8       **DEPUTY DISTRICT ATTORNEY MORRISON:** Okay, this was

9   a semi-automatic pistol; is that correct?

10      **INMATE MARROQUIN THROUGH INTERPRETER:** Yes.

11      **DEPUTY DISTRICT ATTORNEY MORRISON:** And the inmate

12  had the gun behind the seat of his car; is that correct?

13      **INMATE MARROQUIN THROUGH INTERPRETER:** Yes.

14      **DEPUTY DISTRICT ATTORNEY MORRISON:** And he had the

15  magazine in the glove compartment?

16      **INMATE MARROQUIN THROUGH INTERPRETER:** Correct.

17      **DEPUTY DISTRICT ATTORNEY MORRISON:** And he put the

18  magazine in the gun; is that correct?

19      **INMATE MARROQUIN THROUGH INTERPRETER:** Correct.

20      **DEPUTY DISTRICT ATTORNEY MORRISON:** And then did

21  he have to slide to cock the gun back before he fired it?

22      **INMATE MARROQUIN THROUGH INTERPRETER:** No.

23      **DEPUTY DISTRICT ATTORNEY MORRISON:** Did he have to

24  do that twice before he fired it?

25      **INMATE MARROQUIN THROUGH INTERPRETER:** No.

23

1      **DEPUTY DISTRICT ATTORNEY MORRISON:**  Was the victim

2    the inmate's brother-in-law?

3      **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

4      **DEPUTY DISTRICT ATTORNEY MORRISON:**  Had the inmate

5    had an affair with the victim's girlfriend or common-law

6    wife?

7      **INMATE MARROQUIN THROUGH INTERPRETER:**  I don't

8    understand, how do you mean?

9      **DEPUTY DISTRICT ATTORNEY MORRISON:**  Did the inmate

10   have some kind of sexual relationship with Mr. Silva's

11   girlfriend or common-law wife?

12      **INMATE MARROQUIN THROUGH INTERPRETER:**  Yes.

13      **DEPUTY DISTRICT ATTORNEY MORRISON:**  And how long

14   was that before the murder?

15      **INMATE MARROQUIN THROUGH INTERPRETER:**  Lots of

16   times before.

17      **DEPUTY DISTRICT ATTORNEY MORRISON:**  A few months?

18      **INMATE MARROQUIN THROUGH INTERPRETER:**

19   Approximately -- well, more than a year.

20      **DEPUTY DISTRICT ATTORNEY MORRISON:**  Were there

21   hard feelings between the victim and the inmate over this?

22      **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

23      **PRESIDING COMMISSIONER KUBOCHI:**  Do you mind if I

24   have a few questions?

25      **DEPUTY DISTRICT ATTORNEY MORRISON:**  Please.

24

1        **PRESIDING COMMISSIONER KUBOCHI:**  The Appellate

2     Opinion says that in August of 1991, that is a little less

3     than six months before the murder, Luis Silva and his

4     girlfriend, Delcia Lopez, talked to you about buying a

5     car.  Was Delcia Lopez the woman who you had a

6     relationship with?

7        **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

8        **PRESIDING COMMISSIONER KUBOCHI:**  Was it a

9     different woman?

10        **INMATE MARROQUIN THROUGH INTERPRETER:**  Exactly.

11        **PRESIDING COMMISSIONER KUBOCHI:**  And shortly

12     before the homicide, did Silva continue to have his

13     relationship with Delcia Lopez?

14        **INMATE MARROQUIN THROUGH INTERPRETER:**  I don't

15     know.

16        **PRESIDING COMMISSIONER KUBOCHI:**  So the girl that

17     caused the problems was another girl dating Silva?

18        **INMATE MARROQUIN THROUGH INTERPRETER:**  I'm sorry,

19     I don't understand.

20        **PRESIDING COMMISSIONER KUBOCHI:**  The D.A. was

21     asking you questions about whether or not you and

22     Mr. Silva had bad feelings because of your sexual

23     relationship with a woman.

24        **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

25        **PRESIDING COMMISSIONER KUBOCHI:**  No?

25

1          **INMATE MARROQUIN THROUGH INTERPRETER:**   No.

2          **PRESIDING COMMISSIONER KUBOCHI:**   Did I hear that

3     wrong, Mr. Morrison?   Did I misunderstand that?

4          **DEPUTY DISTRICT ATTORNEY MORRISON:**   I think that

5     you heard me correctly and I may have misstated it.   It's

6     very complicated.   It's in the police report, which I had

7     the opportunity to read last week.   And I thought the

8     Panel might be enlightened.   If I can continue, maybe I

9     can clarify it.

10          **PRESIDING COMMISSIONER KUBOCHI:**   By all means, Mr.

11    Morrison, because there is no clarification up until this

12    point.

13          **DEPUTY DISTRICT ATTORNEY MORRISON:**   Who is

14    Jeanette Garay, G-A-R-A-Y?

15          **INMATE MARROQUIN THROUGH INTERPRETER:**   That was --

16    you could call her supposedly my girlfriend.

17          **DEPUTY DISTRICT ATTORNEY MORRISON;**   Okay.   And was

18    the inmate living with Jeanette for about two years before

19    the murder?

20          **INMATE MARROQUIN THROUGH INTERPRETER:**   Exactly.

21          **DEPUTY DISTRICT ATTORNEY MORRISON:**   And was Delcia

22    Lopez Jeanette's sister?

23          **INMATE MARROQUIN THROUGH INTERPRETER:**   Correct.

24          **DEPUTY DISTRICT ATTORNEY MORRISON:**   And was Luis

25    Silva, the victim, living with Jeanette and the inmate?

26

1          **INMATE MARROQUIN THROUGH INTERPRETER:**  Sorry, say

2     that again?

3          **DEPUTY DISTRICT ATTORNEY MORRISON:**  Was the

4     victim, Luis Silva, living with Jeanette and the inmate?

5          **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

6          **DEPUTY DISTRICT ATTORNEY MORRISON:**  Did Jeanette's

7     brother, Juan, and Jeanette's cousin, Melba, also live

8     with the inmate and Jeanette?

9          **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

10         **DEPUTY DISTRICT ATTORNEY MORRISON:**  At some time

11    in August of 1991, did Luis and Delcia begin having an

12    affair?

13         **INMATE MARROQUIN THROUGH INTERPRETER:**  I'm sorry,

14    I don't understand.

15         **DEPUTY DISTRICT ATTORNEY MORRISON:**  Okay.  Did

16    they begin having a romantic relationship?

17         **INMATE MARROQUIN THROUGH INTERPRETER:**  I still

18    don't understand.  I'm sorry.

19         **DEPUTY DISTRICT ATTORNEY MORRISON:**  The source of

20    this -- and let me just read it into the record, is on

21    Page 43 of the Los Angeles Sheriff's Murder Book, an

22    interview with Jeanette Garay.

23              "The witness stated she is Marco's, the

24              inmate, common-law wife and they've been

25              together two years.  Luis, referring to Luis

27

1           Silva, the victim, was living with them since

2           1989.  Her sister, Delcia Lopez, moved into

3           the apartment in 1990.  Her brother, Juan,

4           and cousin, Melba, were also living with

5           them.  In August of 1991, Delcia and Luis

6           began having an affair.  This caused problems

7           with everyone at the apartment because Luis

8           is married to Melba's sister, who is living

9           in Honduras.  They began having arguments and

10          this caused Delcia and Luis to move out and

11          they moved in together."

12    Is that --

13          **INMATE MARROQUIN THROUGH INTERPRETER:**  That's

14    correct.

15          **DEPUTY DISTRICT ATTORNEY MORRISON:**  Okay.  Now, as

16    a result of that, was there any bad blood between the

17    inmate and Luis, other than the argument over the car?

18          **INMATE MARROQUIN THROUGH INTERPRETER:**  No.

19          **DEPUTY DISTRICT ATTORNEY MORRISON:**  After the

20    inmate shot Luis, did another man follow the inmate back

21    to his car and tell the inmate to give up the gun and

22    surrender to the police?

23          **INMATE MARROQUIN THROUGH INTERPRETER:**  There's a

24    confusion there.  The person who was with me at that time

25    when the sheriff arrived, that person was accompanying the

28

1    victim.

2        **DEPUTY DISTRICT ATTORNEY MORRISON:** Was that the

3    man that told the inmate to put the gun down and surrender

4    to the police?

5        **INMATE MARROQUIN THROUGH INTERPRETER:** No. No, he

6    was also arguing and fighting with me.

7        **DEPUTY DISTRICT ATTORNEY MORRISON:** Well, did

8    another man tell the inmate to put the gun down and

9    surrender to the police?

10       **INMATE MARROQUIN THROUGH INTERPRETER:** No one did.

11       **DEPUTY DISTRICT ATTORNEY MORRISON:** And did the

12   inmate tell that man, quote, fuck you, I'll shoot you,

13   too?

14       **INMATE MARROQUIN THROUGH INTERPRETER:** No one,

15   because no one was with me.

16       **DEPUTY DISTRICT ATTORNEY MORRISON:** I have to

17   further questions.  Thank you.

18       **PRESIDING COMMISSIONER KUBOCHI:** Ms. Christensen?

19       **ATTORNEY CHRISTENSEN:** Why didn't you just leave

20   at some point?

21       **INMATE MARROQUIN THROUGH INTERPRETER:**

22   Automatically, well, because I was drunk.

23       **ATTORNEY CHRISTENSEN:** What can you tell this

24   Panel to assure them that something like this would not

25   happen again?

29

1        INMATE MARROQUIN THROUGH INTERPRETER:  Very well.

2    This incident that has happened to me has been a disgrace

3    in my life.  Not only for me, for my family and for other

4    people.  And I feel very bad.  And I feel like someone not

5    necessarily tormented, but I feel deeply regretted because

6    in me there's always been through teachings and education

7    that no one could take someone else's life away.

8    Nonetheless, in this case, and unfortunately my life was

9    in danger it never crossed my mind.

10        ATTORNEY CHRISTENSEN:  How much had you had to

11   drink?

12        INMATE MARROQUIN THROUGH INTERPRETER:  A few

13   beers.

14        ATTORNEY CHRISTENSEN:  Were you used to drinking

15   (overlapping)?

16        INMATE MARROQUIN THROUGH INTERPRETER:  Once in a

17   while, yes.  Once in a while,

18        ATTORNEY CHRISTENSEN:  Had you gotten in fights

19   before?

20        INMATE MARROQUIN THROUGH INTERPRETER:  Never.

21   Never.

22        ATTORNEY CHRISTENSEN:  Do you if they have AA in

23   Honduras?

24        INMATE MARROQUIN THROUGH INTERPRETER:  Not

25   Honduras, but in Guatemala.

30

1        **ATTORNEY CHRISTENSEN:**  Not Honduras, I'm sorry;

2    Guatemala.

3        **INMATE MARROQUIN THROUGH INTERPRETER:**  Yes, there

4    is, yes.

5        **ATTORNEY CHRISTENSEN:**  And would that be your

6    intention to participate?

7        **INMATE MARROQUIN THROUGH INTERPRETER:**  Correct.

8        **ATTORNEY CHRISTENSEN:**  No more questions for him.

9        **PRESIDING COMMISSIONER KUBOCHI:**  I've got a couple

10   questions and also before asking them, the record will

11   reflect that there is a letter from Los Angeles County

12   Sheriff's Department signed by James Curtis.  The letter

13   is dated June 26, 2007 and Curtis is spelled C-U-R-T-I-S,

14   Captain, Homicide Bureau.  Mr. Marroquin, you've been in

15   AA for about ten years or more?

16       **INMATE MARROQUIN THROUGH INTERPRETER:**  More.

17       **PRESIDING COMMISSIONER KUBOCHI:**  That includes the

18   12 Steps?  What is Step 8?

19       **INMATE MARROQUIN THROUGH INTERPRETER:**  If you

20   allow me -- and hopefully I'm not being unwise about this,

21   but learning something from memory is no good.  The way

22   I've been taught and the accurateness of it is to be

23   consistent at the program because my sincerity I hope to

24   reflect it before you, but I don't consider myself

25   (inaudible) either.  It would be useless for me to tell

31

1   you one of the 36 traditions or a number of the 12 Steps.

2   My plan in mind the way I think is to remain in Alcoholics

3   Anonymous for the rest of my life.

4           **PRESIDING COMMISSIONER KUBOCHI:**  Well, what is

5   Step 4?

6           **INMATE MARROQUIN THROUGH INTERPRETER:**  Honestly, I

7   don't know it.

8           **PRESIDING COMMISSIONER KUBOCHI:**  When did you come

9   to California?

10          **INMATE MARROQUIN THROUGH INTERPRETER:**  In 1974 or

11  '75.

12          **PRESIDING COMMISSIONER KUBOCHI:**  You mentioned

13  something about Jimmy Carter.

14          **INMATE MARROQUIN THROUGH INTERPRETER:**  Exactly.

15          **PRESIDING COMMISSIONER KUBOCHI:**  A very bad

16  president in my opinion, but we're not here to discuss

17  politics.  How did you support yourself all those years?

18          **INMATE MARROQUIN THROUGH INTERPRETER:**  Well, based

19  on my education, working.

20          **PRESIDING COMMISSIONER KUBOCHI:**  You had left your

21  wife and children behind in Guatemala?

22          **INMATE MARROQUIN THROUGH INTERPRETER:**  No, I left

23  my wife.

24          **PRESIDING COMMISSIONER KUBOCHI:**  Okay, three of

25  your children moved to California, I believe?

32

1           **INMATE MARROQUIN THROUGH INTERPRETER:**  No, I left
2     my wife alone over there and I came over here.
3           **PRESIDING COMMISSIONER KUBOCHI:**  Correct, but I
4     mean, a couple of your kids came to California?
5           **INMATE MARROQUIN THROUGH INTERPRETER:**  No, they
6     were born here.
7           **PRESIDING COMMISSIONER KUBOCHI:**  And my
8     understanding would by in human nature that if you had
9     this girlfriend in the two years before the shooting, you
10    had never made any plans to go back to Guatemala.
11          **INMATE MARROQUIN THROUGH INTERPRETER:**  Honestly,
12    in this case, most of us -- it was immigrants, especially
13    me, when I came to this country, my intentions were to go
14    back to my country of origin.
15          **ATTORNEY CHRISTENSEN:**  Commissioner, we do have
16    those last letters of support and I believe the one on top
17    is from his wife.
18          **PRESIDING COMMISSIONER KUBOCHI:**  Oh, I'm not
19    discrediting anything.  I'm just trying to find out more
20    about his personal and social history, and we'll read
21    those.  The record should reflect that we have a letter
22    from Lilly, his wife, which we will read.  Also Joshua,
23    who is 21-years old, your son.  And Emerald, which I would
24    gather is your daughter.  She lives in Lawndale.
25          **INMATE MARROQUIN THROUGH INTERPRETER:**  Correct.

33

1          **PRESIDING COMMISSIONER KUBOCHI:**   Marco -- Dear

2     Marco.  And he has a 3-1-0 area code.  Thank you.  Does

3     anyone have any questions before we go into final

4     statements?

5          **DEPUTY DISTRICT ATTORNEY MORRISON:**   If I could

6     just ask another area I don't believe has been covered.

7          **PRESIDING COMMISSIONER KUBOCHI:**   Well, ask the

8     questions of the Panel and we'll see if we'll go forward

9     with it.

10          **DEPUTY DISTRICT ATTORNEY MORRISON:**   How many times

11    has the inmate been deported from the United States and

12    illegally reentered the country?

13          **PRESIDING COMMISSIONER KUBOCHI:**   That's a pretty

14    good question.

15          **INMATE MARROQUIN THROUGH INTERPRETER:**   In the past

16    years, as you said a while ago about President Carter, and

17    close to ten years before, international deportations were

18    nonexistent.  For instance, you arrived at the border,

19    they catch you when you're crossing, 45-minutes later,

20    you're back again.  That's not deportation.  That's simply

21    getting caught.  And I came to this country and I came in

22    through Texas.  Immigration did catch me over there and I

23    was deported.  But because of lack of -- or I should say

24    poverty being -- the Hispanic countries being miserable,

25    unfortunately, that's how we live and that obligates us to

34

1    come back and that's why we're here.  At that time, I had

2    a different mentality than what I have now.  For starters,

3    while I was young, and now I can say I'm old.  My children

4    are of age, they're adults.  You can call them college

5    kids.  I can tell you that they have good positions.  Now

6    I committed not what I would classify as a mistake, but as

7    a stupidity, and I'll be deported.  And once I leave this

8    country, I'll never come back.

9            **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Marroquin,

10   we're going to go into final statements before recessing

11   for deliberations.  You will be the last speaker.  Mr.

12   Morrison?

13           **DEPUTY DISTRICT ATTORNEY MORRISON:**  Thank you.

14   District Attorney (overlapping) opposing parole.  The

15   inmate's versions of the events have somewhat shifted over

16   the years.  He gave a tape-recorded interview to the

17   Sheriff's Department and those reports have been provided

18   to the Board previously, in that he was specifically asked

19   (overlapping) essentially right after the murder and was

20   interviewed by detectives, and on Page 134, these are the

21   handwritten numbers in the Sheriff's Murder Book, the

22   complete file -- reports have been provided.  He's asked

23   the question, "How many beers had you drunk inside the

24   bar?"  Answer, "Well, more or less like two -- like two

25   because -- okay, not even two because with the -- that as

35

1   well as the beer that this was -- they were -- it was the
2   second beer and said I did not finish drinking it because
3   he arrived with his insults. (overlapping) The question
4   is, "Just to say one and a half?" Answer, "Well, it could
5   be one and a half or -- yes, one and a half, one and a
6   half, because it was the moment I had ordered and
7   (overlapping) it well." Question, "And but you were not
8   drunk?" Answer, "I was not drunk, I was not drunk." And
9   later on it says in a question, "Then one and a half
10  beers, almost two, you don't feel drunk?" Answer,
11  "Exactly." Question, "You don't consider yourself legally
12  drunk?" The answer, "Exactly, exactly." Then we get on
13  to what he has told previous Panels in 2002 at his initial
14  hearing on Page 20, Page 19, he is discussing the crime
15  and he says, "I can emphasize this in two points because I
16  was very drunk." And then he goes on and was asked by the
17  Commissioner, "Why didn't you get in the car and leave;
18  you had plenty of time?" The inmate, "Because I've always
19  had this in mind; when I drink, I don't drive. When I
20  would get drunk, I would always call for a taxi to take me
21  home." Question, "So you were too drunk to drive?" The
22  inmate, "I was drunk." The question, "How drunk were
23  you?" The inmate, "To a point that you can't drive."
24  "How long had you been drinking?" "Approximately like two
25  years." The inmate continued, "The fact that I'm telling

36

1   you that I was drunk isn't that I was falling down."  So
2   we have various statements of intoxication that are
3   somewhat questionable.  The Sheriff's Department notes
4   that on Page 2 of the Sheriff's letter, "A witness
5   followed Marroquin back to his truck and ordered Marroquin
6   to put the gun down and surrender to the police.
7   Marroquin retorted, quote, fuck you, I'll shoot you, too,
8   showing the presence of mind and a readiness to do harm
9   after fatally wounding Mr. Silva.  It's a little
10  troublesome that the inmate in the 19 -- excuse me, in the
11  2002 psych report discusses with the psych that in 1976 he
12  came to the U.S. he said primarily because Fidel Castro
13  started ruling.  He said shortly thereafter he was
14  deported back to Guatemala and came back to the United
15  States in one and a half years.  And that sounds like a
16  form of deportation if you came all the way back to
17  Guatemala.  He was examined about this in the 2002 hearing
18  a number of times --

19          **PRESIDING COMMISSIONER KUBOCHI:**  I hate to
20  interrupt you, but what is the point of this?

21          **DEPUTY DISTRICT ATTORNEY MORRISON:**  That the
22  inmate has come back across our totally porous border
23  numerous times.

24          **PRESIDING COMMISSIONER KUBOCHI:**  That point has
25  been made -- established.

37

1          **DEPUTY DISTRICT ATTORNEY MORRISON:**  And that we
2     can't rely on his assurance not to come back to this
3     country.  The shifting versions told in 2006 Panel that he
4     was kidnapped by the victim which caused him to shoot the
5     victim and so the question is credibility about staying
6     wherever he is deported to.  For all of these reasons, we
7     oppose parole.
8          **PRESIDING COMMISSIONER KUBOCHI:**  Ms. Christensen?
9          **ATTORNEY CHRISTENSEN:**  Well, I couldn't disagree
10    more.  Mr. Marroquin has been an outstanding inmate, a
11    model inmate.  The last Panel was very impressed with him.
12    That was only his second hearing, by the way.  At his
13    first hearing, he got a three-year denial, and then the
14    second time out of the box, they gave him a one-year.  And
15    the reason for that is because the Panel -- and this is
16    presiding Commissioner Shelton, said on Page 74 that he is
17    -- let me get the right thing here, just a second.  Okay,
18    actually on Page 72, she says, "You have done an
19    extraordinarily wonderful job," and then the next page,
20    Page 73, she goes on to say that they're totally impressed
21    by his presentation and she says we believe you to be
22    telling us the truth.  Mr. Marroquin was so pleased with
23    his last hearing that he felt that all he had to do was
24    continue the same good work that he had been doing all
25    along and just bring parole plans to the Board.  That's

38

1   what he has done.  The parole plans that he has -- his

2   wife has provided him with an address where they will live

3   in Guatemala.  She has been married to him for 30 years,

4   has stood by him throughout this ordeal, through thick and

5   thin and whatever happens in the past, she is still his

6   wife and the three children that they have together are

7   all equally supportive.  There are letters of support from

8   all three.  They're all very close to their father.  They

9   visit him frequently and they're all offering their

10  support, even though the wife is the only one who is

11  planning to move.  In terms of what he would do for

12  employment, the last Panel took a look at that, too -- and

13  give me just a minute to find that.  On Page 76, the

14  Commissioner said that, "You've got these diesel mechanic

15  skills," and he had also worked in marble in the past and

16  has started his own business.  And then Commissioner

17  Shelton says, "We know that you have the ability to

18  provide for yourself.  Commissioner Keenan and I believe

19  that you can take care of yourself and your family, no

20  problem."  Commissioner Keenan called you an entrepreneur,

21  that means you can survive on your own with your skills

22  and your intellect.  So Mr. Marroquin, who fairly recently

23  completed his diesel mechanic vocation is going to take

24  those skills with him to his country of origin and it is

25  his plan to open a shop and that is what he intends to do.

39

1    I don't see why that cannot be a reality for him.  He was

2    a responsible husband and father before coming to prison.

3    In fact, that was even noted by the judge in this case.

4    I'm looking back at the sentencing transcript and report.

5    The report says -- that was on specifically January 4th,

6    1993, and the judge in sentencing Mr. Marroquin said that,

7    "I do realize Mr. Marroquin has never been in trouble with

8    the law before and he has been a good husband and provider

9    to his family," and the Court then went on to say that

10    because of that, they're imposing the low term for use of

11    a firearm in this case.  So this crime was really very,

12    very much out of character for Mr. Marroquin.  He is not

13    at all a violent person.  He has no tendencies in that

14    regard.  He's got no prior criminal history.  He was never

15    violent before.  He hasn't been violent since.  He's

16    gotten no 115s.  He's been an outstanding inmate here,

17    causes no problems whatsoever, extremely positive

18    behavior.  Everything's in place for him to success on

19    parole.  He's trying extremely hard.  The Panel last time

20    told him to just keep up what he was doing, to get more

21    self-help.  He continues to be in his 12-Step Program.

22    Maybe he recite the Steps, but I'm sure he benefits from

23    regularly attending and he will continue to do so wherever

24    he happens to be.  He's on the waiting list for

25    Alternatives to Violence.  He's really trying very, very

40

1    hard.  He takes the Boards recommendations very seriously.

2    He is hoping that you can see that, as the psychologist

3    has said, he is a very low risk and poses no more risk to

4    society than the average person in the community.  And the

5    psychological evaluation says that there are no risk

6    factors in this case.  So, to me, that appears to be

7    someone who is really worthy of the Board granting

8    (overlapping).  Yes, he has in the past, come back to this

9    country and he wasn't supposed to.  But he's not going to

10   do it again.  He has learned his lesson.  He will not re-

11   offend and has the skills to make a good living for

12   himself and his family back in Guatemala.  So I urge this

13   Panel to send him back there.  Thank you.

14        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

15   much.  Mr. Marroquin, before we recess, we'd like to hear

16   why you believe you're suitable for parole at this time.

17        **INMATE MARROQUIN THROUGH INTERPRETER:**  Well, if

18   you allow me -- if you allow me, I can go --

19        **ATTORNEY CHRISTENSEN:**  You know what, Mr.

20   Marroquin, why don't you give that to the interpreter to

21   translate?

22        **PRESIDING COMMISSIONER KUBOCHI:**  And we'll take

23   paraphrasing.

24        **INTERPRETER ZAVALA:**  Okay.  Probably easier if

25   just read it.

41

1          **PRESIDING COMMISSIONER KUBOCHI:**  Yes, that's what
2    I'm saying.

3          **ATTORNEY CHRISTENSEN:**  Paraphrasing is good.

4          **INTERPRETER ZAVALA:**  Okay.  Okay, Commissioners
5    and magistrate that represent the public in general, allow
6    me -- since you have given me the opportunity to deepen
7    myself into this hearing, the following is my request.
8    That you, as representatives of the law, can decide and do
9    please decide the subject -- the following and to consider
10   the pros and cons in analyzing everything within what's
11   reasonable.  In this case, my guiltiness for this incident
12   has not been easy to overcome because I feel miserable
13   before God and before earthling man.  That is why I am
14   before you and I am in your hands.  And it's all hanging,
15   not on the law, because I've already complied with my
16   sentence, but now it depends on the human conscience that
17   guides us through God.  I would like it to be a unanimous
18   decision or that is a mutual consent one.  I hope I'm not
19   wrong, but I hope this time can be a different decision in
20   order to grant my freedom.  I am a foreigner and you know
21   that I will be deported to the country of my origin,
22   Guatemala.  And you can decide on my deportation or better
23   said to transfer me to the Immigration Department or that
24   it is an order from you as Commissioners of the law which
25   will be heard and which would be valid.  If within your

42

1    means, you can make an exception in my regards, and at the

2    same time, freeing the congestion that there is here in

3    the prisons, which you know -- which you are aware of how

4    saturated they are.  I apologize for my expression or the

5    way I am expressing myself, but after 16 years of

6    incarceration, it is fair that you make a positive

7    decision to take my case into account conscientiously and

8    that I be freed.  I hope and I expect that your decisions

9    would be human-like, because after all, I am a human being

10   appreciative of whatever decision comes out today.  I

11   consider myself a reasonable person and I assume any

12   responsibility for the case.  I regret so much of what

13   happen and I offer my sincere apology for everything.  And

14   above all, I appreciate the fact that you gave me this

15   space to thank you in this hearing.

16        **PRESIDING COMMISSIONER KUBOCHI:**  It's 2:47 and

17   we're going to be in recess.

18                    **R E C E S S**

19                     --o0o--

20

21

22

23

24

25

43

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **PRESIDING COMMISSIONER KUBOCHI:**  Ready?  It is

4     3:12 p.m. and we're back in session on the matter of

5     Marroquin and I'm going to announce our decision.

6     Mr. Marroquin, we have reviewed all information and we're

7     going to deny you parole for a year.  And we're going to

8     discuss some issues that are very important, because with

9     the comments quoted from your prior parole hearing, there

10    is some concern about, from this Panel, in regard to your

11    progress in regard to rehabilitation efforts.  In looking

12    at the facts of the crime itself, this offense was

13    carried out in a very callous manner in that you armed

14    yourself with a semiautomatic handgun.  And we're not

15    going to retry your case, but the facts of the Appellate

16    Opinion, you simply had a dispute with the victim, Mr.

17    Silva, over a purchase by Mr. Silva and his girlfriend of

18    a car and that Mr. Silva and the girlfriend, Ms. Lopez,

19    returned the car because it had a lot of defects.  He

20    returned the keys to you.  You didn't want to take the

21    keys back.  You wanted $1,000.00 for the days that the

22    car was used and when Mr. Silva returned the keys and the

23    car, the evidence produced at trial was that you said

24    that he would regret what he had done.  And that turned

25    **MARCO MARROQUIN    H-62380    DECISION    PAGE 1    07/25/07**

44

1    out to be true on the events that happened on January

2    12th, 1992 in that you saw him at the bar, and at some

3    point, you pulled out your gun. Wracking means putting a

4    bullet into the chamber in an automatic by pulling back

5    on it because thereafter by pulling the trigger, the

6    mechanism is gas-operated. You wracked the gun one time

7    to put a bullet in, yet nothing happened. You wracked it

8    again and then you shot him. It demonstrates that this

9    was a purposeful act on your part. In the big picture,

10    it was a murder that resulted in a simple dispute over a

11    vehicle, which is the cause of a lot the concern by this

12    Panel, because it demonstrates that you have the capacity

13    to take the law in your own hands, and more importantly,

14    to take the life of another simply because the underlying

15    dispute didn't go your way. Your motive for this crime

16    was inexplicable and very trivial in relation to the

17    offense. And these factors that I've outlined are very

18    important to this Panel because we are balancing that to

19    your institutional behavior and the record should reflect

20    that institutional behavior is but one of eight factors

21    of suitability. You have not worked, you have not

22    obtained a vocation. All the time from 2000, you have

23    been in Adult Basic Education. As I've indicated, from

24    2000, you have no vocation skills. From 2000, you

25    **MARCO MARROQUIN    H-62380    DECISION    PAGE 2    07/25/07**

45

1   haven't had a work position.  Yet, in your most recent
2   academic review, you received a D-plus.  In your T-A-B-E,
3   TABE, score, your achievement level went down.  The one-
4   year denial really is putting you on notice, Mr.
5   Marroquin, that we, the Board of Parole Hearings, are
6   expecting more effort on your part.  The one-year denial
7   may, in view of the life crime, may become a greater
8   length of denial in the future if you continue in having
9   a downward slope on your rehabilitation.  You have been
10  in self-help for more than ten years.  And the AA 12 Step
11  Program, I asked you Step 4 and Step 8 and you had no
12  ability to answer these questions.  Questions during the
13  parole hearings are not to test your memory, but the
14  extent that you have internalized and taken to heart the
15  principles in the 12 Step and AA programs.  Your verbal
16  excuse as to why you could not articulate or describe
17  Steps 4 and 8 we find are unacceptable and demonstrates
18  the fact that while you are attending, there's some
19  concern and question as to the sincerity of your efforts
20  and the extent to which you truly are internalizing the
21  values that are instructed in this program.  In regard to
22  your parole plans, during this hearing you have admitted
23  making no efforts to obtain a job.  I think everyone here
24  has impressed upon you the fact that the INS hold and
25  **MARCO MARROQUIN**   **H-62380**   **DECISION**   **PAGE 3**   **07/25/07**

46

1   deportation to Guatemala will not excuse you from

2   establishing documented parole plans.  In regard to being

3   self-sufficient, by listening to your description says

4   that the motivation for you leaving Guatemala in the

5   first place and coming back, even after having been

6   deported; the standard of living in Guatemala was

7   unacceptable to you and that you felt that you could make

8   a greater life to yourself, even at the expense of

9   leaving your wife behind by coming to the United States.

10  Therefore, under the totality of those circumstances, we

11  are going to request that you establish plans to become

12  self-sufficient and demonstrate at the next Panel your

13  personal efforts to find a job in Guatemala.  There is no

14  requirement that you have a job offer, but efforts,

15  however, will be assessed.  The Panel makes the following

16  findings that based upon the circumstances surrounding

17  the life crime in which there was a simple dispute with

18  Mr. Silva over the purchase of a used automobile and that

19  upon the return of that vehicle and the refusal to

20  purchase the vehicle by Mr. Silva, that you became so

21  angry that you armed yourself.  And that after meeting

22  Mr. -- seeing Mr. Silva in a bar, you shot him.  He was

23  unarmed.  We have heard and reviewed prior indications

24  that you believe that it was justifiable because of self-

25  **MARCO MARROQUIN    H-62380    DECISION PAGE 4   07/25/07**

47

1    defense.  However, in looking at the Appellate Decision

2    in your case, there was a specific jury instruction that

3    your appellate attorney contended was violated your

4    rights, but that instruction is as follows, that the

5    right of self-defense is not available to a person who

6    seeks to quarrel with the intent to create a real or

7    apparent necessity for exercising self-defense.  And the

8    Appellate Court agreed with the Trial Court in the manner

9    in which your trial was conduct and essentially you

10   occupied the very position that the law does not allow.

11   It is when you confront somebody and you have a firearm

12   and they have no firearm and you start the argument, that

13   you can't create a situation in which under a claim of

14   self-defense when you take somebody else's life.  And

15   whether you truly have insights as to what you did that

16   day is something only that you have control over.  This

17   Panel considers your minimization and your stated

18   justifications now and in prior statements describing

19   your involvement, we have concerns as to whether you

20   really have an understanding of the causation factors.

21   And for all the reasons discussed, we believe that parole

22   is not suitable at this time for you.  We find that you

23   continue to need therapy in order to face, discuss,

24   understand, and cope with stress in a nondestructive

25   **MARCO MARROQUIN   H-62380   DECISION   PAGE 5   07/25/07**

48

1    manner.  Until progress is made, you continue to be

2    unpredictable and a threat to others.  Therapy in a

3    controlled setting is needed, but motivation and

4    amenability are questionable at this time,

5    notwithstanding the physical efforts that you had made.

6    On the positive, you have not been involved with a 115

7    and that is very rare.  But we're putting you on notice

8    that with your declining test scores, the fact that you

9    have not had a work position and the fact that you've

10   been in AA for 12 years, but can't talk about two of the

11   basic Steps that are very important for rehabilitation,

12   that we're going to have to see some effort in the next

13   year.  Commissioner?

14        **DEPUTY COMMISSIONER YACONO:**  I did want to make

15   clarification that there was a certificate that he's a

16   mechanic.  Normally you're not allowed to even get in the

17   program unless you have a certain reading level.  In my

18   review of the Central File, you had over a six-point

19   reading as your highest.  It's way low today.  And your

20   last teacher gave you a D-plus saying you aren't doing

21   any work.  You maybe misinterpreted the last Panel's

22   encouragement.  This is life with the possibility, not

23   the promise, of parole.  You cannot go to sleep now

24   because now is the time to work harder.  Nobody's going

25   **MARCO MARROQUIN   H-62380   DECISION   PAGE 6   07/25/07**

49

1    to let you out unless they're assured.  Getting deported,

2    we don't care where you're being released to.  We care

3    and we're going to meet the same criteria no matter where

4    you're going to go.  So you also have to be aware that

5    there is a matrix.  It doesn't matter you got 18-to-life

6    in court.  The Parole Board has its own (overlapping)

7    Your matrix means you do the 17, 18, 19 years on the life

8    crime and that's for consideration.  So you've been here

9    just under 16 years with no credit.  This is the time

10   when you want to really look good in the next couple of

11   years before you're coming back on this Board again.  We

12   talked seriously about giving you a two-year denial.  A

13   128 is not real serious, but it looks like you went to

14   sleep and you're floating through this.  You're

15   ///

16   ///

17   ///

18

19

20

21

22

23

24

25   **MARCO MARROQUIN    H-62380    DECISION    PAGE 7    07/25/07**

50

1

2    definitely lacking effort and definitely retired and

3    decided that you were just going to float in here.  You

4    need to get back to work.

5         **PRESIDING COMMISSIONER KUBOCHI:**  It's now 3:26 and

6    this matter is concluded.

7                    **A D J O U R N M E N T**

8                         --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21   **PAROLE DENIED ONE YEAR**              NOV **2 2** 2007

22   **THIS DECISION WILL BE FINAL ON:**_____

23   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

24   **DATE, THE DECISION IS MODIFIED.**

25   **MARCO MARROQUIN    H-62380    DECISION    PAGE 8    07/25/07**

51

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER


        I, GITA SCHMITZ, a duly designated transcriber,

FOOTHILL TRANSCRIPTION COMPANY, INC., do hereby declare

and certify under penalty of perjury that I have

transcribed the audio recording which covers a total of

pages numbered 1 - 50, and which recording was duly

recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD,

CALIFORNIA, in the matter of the SUBSEQUENT PAROLE

CONSIDERATION HEARING of MARCO MARROQUIN, CDC No. H-

62380, on JULY 25, 2007, and that the foregoing pages

constitute a true, complete, and accurate transcription

of the aforementioned audio recording to the best of my

ability.

        I hereby certify that I am a disinterested party in

the above-captioned matter and have no interest in the

outcome of the hearing.

Dated August 20, 2007 at Placer County, California.


Gita Schmitz

_____
Gita Schmitz, Transcriber
**Foothill Transcription Company, Inc.**

# EXHIBIT "B"

COPY

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION FIVE

In re

**MIKAEL SCHIOLD,**

Petitioner-Appellee,

**On Habeas Corpus.**

A103107

San Francisco County Superior Court No. 4523
The Honorable Ksenia Tsenin, Judge

## SETTLEMENT AGREEMENT AND FULL
## AND FINAL RELEASE OF ALL CLAIMS

BILL LOCKYER
Attorney General of the State of California

ROBERT R. ANDERSON
Chief Assistant Attorney General

FRANCES T. GRUNDER
Senior Assistant Attorney General

JULIE L. GARLAND
Supervising Deputy Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General
State Bar No. 189613

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5713
Fax: (415) 703-5843

Attorneys for Respondents/Appellants

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FIVE

| | |
|---|---|
| In re | A103107 |
| **MIKAEL SCHIOLD,** | |
| Petitioner-Appellee, | |
| **On Habeas Corpus.** | |

**SETTLEMENT AGREEMENT AND FULL
AND FINAL RELEASE OF ALL CLAIMS**

"Releasor":  MIKAEL SCHIOLD

"Releasees": GRAY DAVIS, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF CALIFORNIA; THE
BOARD OF PRISON TERMS; MICHAEL E. KNOWLES,
IN HIS OFFICIAL CAPACITY AS THE WARDEN OF
MULE CREEK STATE PRISON; AND CAROL A. DALY,
IN HER OFFICIAL CAPACITY AS THE CHAIRPERSON
OF THE BOARD OF PRISON TERMS

1.    Releasor, petitioner-appellee Mikael Schiold, is currently in the
custody of the California Department of Corrections pursuant to his
conviction by guilty plea to second-degree murder while using a deadly
weapon.  Schiold's sentence is fifteen years to life plus one year.  Schiold is
identified by the Department of Corrections as inmate number D-31112.

2.    The Board of Prison Terms found Schiold suitable for parole on
April 11, 2002.  On September 6, 2002, the Governor reversed that decision
and found Schiold unsuitable for parole.

3.    Schiold filed a petition for writ of habeas corpus in San Francisco

1

COPY

Superior Court, Case No. 4523, challenging the Governor's determination that he was unsuitable for parole. The Superior Court granted that petition, and respondents-appellants appealed to the First District Court of Appeal, Case No. A103107.

4. Releasor and releasees desire to enter into this settlement agreement in order to provide for a recommendation that Schiold be transferred to the custody of Sweden under the Convention on the Transfer of Sentenced Persons in full settlement of all claims which are or might have been the subject of the petition in this case, upon the terms and conditions set forth below.

5. This release is executed in consideration of the Board of Prison Terms submitting, with its approval, the application of Schiold for custodial transfer to Sweden under Government Code section 12012.1 and the Convention on the Transfer of Sentenced Persons.

6. Releasor Schiold agrees that upon approval of the transfer by the United States Department of Justice, Sweden, and any other necessary entities, and upon transfer to Sweden, he will stipulate to vacate the San Francisco Superior Court's order granting the petition in Case No. 4523. Releasor Schiold further agrees that pursuant to the satisfaction of the conditions of this paragraph, he will then dismiss the petition in San Francisco Superior Court Case No. 4523.

7. Releasor and releasees agree to stay Court of Appeal Case No. A103107 pending resolution of this settlement. The stay shall immediately terminate on October 29, 2003 if before that date releasees have not fully complied with their obligations set forth in paragraph 5. Moreover, the stay shall immediately terminate on December 25, 2003 if releasor Schiold is not in Sweden prior to that date. However, with respect to the immediately preceding sentence only, releasees may file a motion to continue the stay

2

COPY

past December 25, 2003 based upon a showing that the transfer process is proceeding expeditiously. If the stay terminates pursuant to the terms of this paragraph, releasor and releasees agree that the filing and service of the opening brief in Court of Appeal Case No. A103107 will be due two weeks after the stay terminates. Releasees agree to voluntarily dismiss that appeal upon releasor's dismissal of the petition described in paragraph 6.

8.    Releasor agrees that he will be held in custody by the government of Sweden until January 1, 2007.

9.    Releasees agree that so long as Schiold and the government of Sweden comply with this agreement, they will take no further action against releasor arising from his conviction in San Francisco County Superior Court Case No. 119276.

10.    Upon full satisfaction of the conditions set forth in paragraph 6, Schiold thereafter fully and forever releases and discharges: the respondents-appellants in the above-captioned case and in San Francisco Superior Court Case No. 4523; the State of California; the California Department of Corrections; the Chairperson of the Board of Prison Terms; and each of their employees, agents, servants, and other representatives, past and present, from all claims, demands, actions, and causes of action, including claims for attorneys' fees, court costs, and other costs of suit, that are or could have been the subject of the petition for writ of habeas corpus in San Francisco Superior Court Case No. 4523. This release expressly does not apply to the obligations set forth in this settlement agreement.

11.    In making this release, Schiold understands and agrees that he relies wholly upon his own judgment, belief and knowledge as to the nature, extent, effect, and duration of liability. The making of this release is without reliance upon any statement or representation of any of the releasees or their agents.

3

COPY

12.    It is expressly understood by Schiold that the approval and submitting of the application for transfer under the Convention on the Transfer of Sentenced Persons referenced in paragraph 5 of this release constitutes a compromise of a disputed claim, and that the releasees expressly deny any and all liability in the above-captioned case.

13.    This agreement shall constitute the entire agreement between releasor and releasees, including attorney's fees, arising from the actions described in paragraph 3, and it is expressly understood and agreed that this agreement has been freely and voluntarily entered into by all parties, and each of them. It may not be altered, amended, modified, or otherwise changed in any respect except by writing duly executed by the parties to this agreement.

14.    This agreement shall be governed by and construed in accordance with the laws of the State of California.

15.    This release is freely and voluntarily made. Schiold has not been influenced to any extent in making this release by any representations or statements made by any of the releasees or their agents except as set out herein.

///

///

4

COPY

P.02

16.   Facsimile signatures shall bind the parties to this agreement.

Date: _10/22/03_

ETHAN A. BALOGH
KEKER & VAN NEST
Attorneys for Petitioner-Appellee Mikael Schiold

Date: _10/22/03_

ANYA BINSACCA
Supervising Deputy Attorney General
Attorney for Releasees Gray Davis, in his official capacity as Governor of
the State of California; the Board of Prison Terms; Michael E. Knowles, in
his official capacity as the Warden of Mule Creek State Prison; and Carol A.
Daly, in her official capacity as the Chairperson of the Board of Prison
Terms

40009425.wpd

5

# EXHIBIT "C"

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

LAW OFFICES OF
PICONE & DEFILIPPIS
625 North First Street
San Jose, CA 95112

JUN 26 2006

John A. Clarke, Executive Officer/Clerk

By _____ Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re,

ROBERT ROSENKRANTZ,

        Petitioner,

On Habeas Corpus

)
)
)
)
)
)
)
)
)
)

Case No.: BH003529
ORDER RE: WRIT OF HABEAS CORPUS

    The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17, 2005, as well as the return and denial filed in response to the court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision denying petitioner parole is not supported by "some evidence."

    Petitioner is currently serving a sentence of 15 years to life with a two-year firearm enhancement following his 1986 conviction of second degree murder. Petitioner's minimum eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the argument that the Board violated its regulations and petitioner's right to due process by its refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him an unreasonable risk to public safety if paroled.

    On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner parole, the Board relied upon the circumstances of the commitment offense. When determining

1

ep

unsuitability based on commitment offense, the Board may consider as a factor whether the victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15, § 2402(c)(1)(C).) Here, the Board found that the victim was "abused" due to "the number of times he was shot and the manner in which he was shot." In addition, the Board concluded that the case "rises to the highest level of second-degree murder." The Board further stated in its decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed parole. While the Board is required to consider such opposition (see Penal Code section 3042), that opposition is not a factor on which the Board may rely to deny parole as enumerated in title 15, section 2281 of the California Code of Regulations.

Towards the conclusion of the hearing, the Board summarily mentioned its concern that petitioner is a danger to his brother, Joey. The court finds that this assertion is not only unsupported by the record, but belied by the record, which contains documented evidence that contradicts any fear that the petitioner is a threat to his brother's safety. Furthermore, the court rejects the Board's inference that the absence of yearly supportive letters from petitioner's brother shows that petitioner is a danger to his brother. In fact, the petitioner's denial and traverse draws attention to a recent psychological evaluation addressing and dismissing the Board's concern for the safety of petitioner's brother. However, because this psychological evaluation was not evidence before the Board at the time of petitioner's hearing, the court may not properly rely upon it in reviewing the Board's decision. Regardless, the court finds that there is no evidence in the record that supports the conclusion that petitioner remains a danger to his brother.

The Board's sole reliance on the gravity of the offense to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916.) However, over time, should petitioner continue to demonstrate exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the nature of the commitment offense raises serious questions involving his liberty interest in parole. (*Id.* at p. 917.) Here, petitioner's record is replete with reports of petitioner's exemplary conduct as well as his vocational and educational achievements over a period of many years. Indeed,

ep                                          2

petitioner is a model prisoner in every respect. A parole decision supported by some evidence may nonetheless abrogate due process if it did not consider and weigh all favorable evidence. (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

The court finds that petitioner's continual parole denials have been based mainly on the gravity of the commitment offense, the circumstances of which can never change. Therefore, the Board's continued sole reliance on the commitment offense will essentially convert petitioner's original sentence of life with the possibility of parole into a sentence of life without the possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936, 947.)

Prior Board panels have found petitioner suitable for parole. Petitioner was found suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the maximum term for both second degree and first degree murder. Therefore, the commitment offense should no longer function as a factor for unsuitability and in that case, it should no longer operate as "some evidence" to support the Board's parole denial. Petitioner has reached the point in which the denial of parole can no longer be justified by reliance on his commitment offense. The Board's continued reliance on the circumstances of the offense runs contrary to the rehabilitative goals espoused by the prison system and has violated petitioner's due process.

//
//
//
//
//

ep                                                3

1    Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2  granted.

3

4  June 26, 2006

5

6                                                    DAVID S. WESLEY

7                                                    Judge of the Superior Court

8  Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ep                                          4

# EXHIBIT "D"

*PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PAROLE HEARINGS*
*REVISED SEPTEMBER 1998*
*PAROLE CONSIDERATION HEARING*
*JANUARY 2006 LIFE-TERM INMATE CALENDAR*

*CORRECTIONAL TRAINING FACILITY, SOLEDAD*
*MAY 11, 2006*

*NAME:*        MARROQUIN, MARCO
*CDC #:*        H-62380
*DOB:*          07/30/56
*OFFENSE:*   Penal Code 187, Murder, Second Degree
*SENTENCE:* 18 years to Life
*DATE OF OFFENSE:* 01/14/92
*MEPD:*         12/24/03
*EVALUATION DATE:* 05/11/06

## I.    *IDENTIFYING INFORMATION:*

Inmate Marroquin is a 50-year-old, first-term, married, Hispanic male who was born and raised in Guatemala. He was sentenced by Los Angeles County. He is a Christian. He has 13 years of his sentence. He has a USINS hold and plans to return to Guatemala when he is released.

### *SOURCES OF INFORMATION:*

This evaluation is based upon a single, one-hour interview, plus review of the Central file and medical file.

Since he is a primarily Spanish-speaking inmate, a certified translator was used during this interview.

The prior psychological evaluation, dated 08/05/02, completed at CTF by Dr. Howlin for the Board of Prison Terms, is still current and valid. The psychosocial assessment completed at that time was reviewed with the inmate, and it is still current and valid. As a result, it will not be repeated at this time.

### *CLINICAL ASSESSMENT*

## XII.   *CURRENT MENTAL STATUS/TREATMENT NEEDS:*

Inmate Marroquin related in a serious, sober, business-like, cooperative manner. The mental status is within normal limits. He is alert and well oriented. His

*MARROQUIN, MARCO*
*CDC NUMBER: H-62380*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE TWO*

thinking was rational, logical, and coherent. His speech was normal, fluent, and goal-oriented. His affect was appropriate. There was no evidence of anxiety or depression. His eye contact was good. Intellectually, his functioning was in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were good.

Inmate Marroquin has sought out and obtained individual counseling with Dr. Reed at CTF. He has received several hours of individual counseling, dealing with the commitment offense and other related issues. Dr. Reed indicated that there were no mental or emotional problems evident in this case.

Inmate Marroquin was under the influence of alcohol at the time of the commitment offense. He has continued to attend Alcoholics Anonymous over the years. Although alcohol is readily available to inmates in the prison setting, he has shown self-control, maturity, and responsibility by totally abstaining from any use of alcohol during his 13 years of incarceration. Therefore, this is certainly not a current problem in his life.

According to his file, he has obtained certification as a diesel mechanic. He plans to return to Guatemala and work as a truck driver. He plans on repairing his own diesel trucks. His release program, living with family members in Guatemala and working as a truck driver, appears to be realistic and viable.

### *CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):*

| | |
|---|---|
| *AXIS I:* | No contributory clinical disorder. |
| *AXIS II:* | No contributory personality disorder. |
| *AXIS III:* | No contributory physical disorder. |
| *AXIS IV:* | Life-term incarceration. |
| *AXIS V:* | Current GAF = 85. |

### *XIII.   REVIEW OF LIFE CRIME:*

Inmate Marroquin accepts full responsibility for the commitment offense. He accepts the description of the offense contained in the Central file. He was intoxicated on alcohol at the time of the commitment offense. He admitted that he shot the victim during an altercation. He felt that his life was in danger, so he responded by shooting the victim. He stated that the victim was attacking him at

*MARROQUIN        H-62380        CTF-SOLEDAD        05/11/06        gmj*

*MARROQUIN, MARCO*
*CDC NUMBER: H-62380*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE THREE*

the time. He is very sorry that this happened. He stated that he did not intend to kill the victim. His feelings of sorrow and remorse appear to be genuine.

This offense appears to be quite situational. It also is related to the fact that he had been drinking alcohol, resulting in the use of poor judgment and release of inhibitions.

## XIV.  *ASSESSMENT OF DANGEROUSNESS*:

    *A.*    In considering his potential for dangerous behavior in the institution, inmate Marroquin has never received any serious disciplinaries. He has never been involved in riots, possession of weapons, threats to others, or any other dangerous behavior. Since we have frequent racial disturbances at this prison, the fact that he is not involved in commendable. In comparison to other inmates, his potential for dangerous behavior is below average.

    *B.*    In considering his potential for dangerous behavior if released to the community, the Level of Service Inventory-Revised, was administered. This is an actuarial measure that assesses criminal background, substance abuse history, social relationships, academic and vocational achievement, family relationships and other factors to determine current risk level on parole. He does not have a history of prior arrests. His score places him at the 1.8 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 98 of them. This is a very low risk level. As a result, he poses no more risk to society than the average citizen in the community.

    *C.*    At this point in his life, there are no significant risk factors in this case.

## XV.  *CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:*

There are no mental or emotional problems in this case that would interfere with routine release planning. Inmate Marroquin is primarily Spanish-speaking, and he will need the assistance of an interpreter at his BPH hearing. He plans on returning to Guatemala as soon as he is released from prison. He has family

*MARROQUIN, MARCO*
*CDC NUMBER: H-62380*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE FOUR*

support in Guatemala. He has the family home available to him, as well as assistance from family members to help him get established. He plans on buying a truck and maintaining it himself. He will be assisted in this project by his family. He is married, and his wife plans on returning to Guatemala with him. The prognosis for successful adjustment in the community is very good.

*M. Macomber, Ph.D.*
*Staff Psychologist*
*Correctional Training Facility, Soledad*

*B. Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*MM/gmj*

*D: 05/11/06*
*T: 05/12/06*

*C:\Documents and Settings\gjorgensen\My Documents\00 - BPT REPORTS - 2006\MARROQUIN H-62380 06-06 MACOMBER.doc*

1

## DECLARATION OF SERVICE BY MAIL

2

3      I, Marco Marroquin, declare that I am over 18 years of
age and that I am the proper petitioner to the hereto cause of
action. My complete mailing address is Marco Marroquin, H-62380

4      P.O. Box 689 GW-123L, California State Prison, Soledad, Ca
93960-0689.

5

6      I, Have served a true and correct original of the attached
petition for writ of habeas corpus, with postage fully prepaid

7      and deposited said documents in the U.S. Mail Box (prison mail
box rule), addressed to the following parties.

8

9      OFFICE OF THE CLERK
UNITED STATES DISRICT COURT

10     NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.

11     SAN FRANCISCO, CA 94102-3483

12

13

14                         ## DECLARATION

15     I, declare under penalty of perjury that the following
is true and correct. Executed this  17  day of June, 2008, at

16     Soledad, California.

17

18

19

20

21     Marco marroquin

22

23

24

25

26

27

28

CONFIDENTIAL LEGAL M

CONFIDENTIAL LEGAL M

LEGAL MAIL

LEGAL MAIL

MARCO MARROQUIN, H-62380
CORRECTIONAL TRAINING FACILITY
P.O.Box 689
SOLEDAD, CA 93960-0689

RECEIVED

JUN 2 3 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

6/10/08

E. DEGUZMAN

Inspected

LEGAL MAIL

LEGAL MAIL

EGAL MAIL